234 N.J. Super. 2 (1989)
560 A.2d 68
GEORGE E. LONGOBARDI, JR., PLAINTIFF-APPELLANT-CROSS-RESPONDENT,
v.
CHUBB INSURANCE COMPANY OF NEW JERSEY, CHUBB & SON, INC., AND FEDERAL INSURANCE COMPANY, DEFENDANTS-RESPONDENTS-CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted March 20, 1989.
Decided June 9, 1989.
*5 Before Judges PETRELLA, SHEBELL and GRUCCIO.
Leo B. Mazer, attorney for appellant/cross-respondent George E. Longobardi, Jr.
Gennet & Kallman, attorneys for respondents/cross-appellants Chubb Insurance Company of New Jersey, Chubb & Son, *6 Inc. and Federal Insurance Company (Harry Robinson, III, on the brief).
The opinion of the court was delivered by PETRELLA, P.J.A.D.
Plaintiff George E. Longobardi, Jr. appeals from a judgment dismissing his complaint based upon the jury's answers to special interrogatories. He had sought recovery under the terms of his insurance policy for losses of certain items of personal property stolen in a burglary. Defendants Chubb Insurance Company of New Jersey (Chubb) and Federal Insurance Company (Federal)[1] had denied coverage, contending that Longobardi had participated in the loss and gave false information on subjects material to the investigation during its consideration of the claim. The jury found that there were no false statements in the application and no participation by Longobardi in causing the loss. However, it found that he had made "material" false statements in the post-loss examination under oath. The complaint was dismissed and Longobardi appealed. Defendants cross-appealed certain rulings of the trial judge.
On this appeal, Longobardi's main argument is that one of the special interrogatories, number six, was erroneous because it permitted the jury to conclude that his obligation after the loss was controlled by the insurance company's subjective interpretation of "false swearing," rather than the provisions of the insurance policy and the applicable law. Longobardi also argues that his admittedly false statements after the loss were immaterial as a matter of law and that the question should not have been submitted to the jury. In addition, he argues that the judge should have instructed the jury that Chubb had the burden of proving that his statement in the examination under *7 oath was made with intent to defraud the insurer in the loss claim. He asserts that failure to do so was plain error, and that this is particularly so where Chubb had not proven that a fraud was committed in the loss claim, and where it had not shown that it was prejudiced by any subsequent false statement. Finally, Longobardi argues that the challenged interrogatory was inconsistent with the judge's instructions to the jury, since it failed to address the critical elements of fraud in the loss claim or reliance on his subsequent false statements with resultant prejudice.
On its cross-appeal defendants argue that the trial judge committed reversible error by refusing to allow Chubb's underwriter, Annette Paolino, to testify about what action she would have taken had she obtained information from Longobardi's prior insurance company relating to his attempt to insure with that company. They also argue that this error was compounded when the judge did not charge the jury that the misrepresentations contained in the policy application were material as a matter of law. Defendants contend that the judge also erred by refusing to admit into evidence two letters purporting to establish "cancellation" of prior insurance coverage. They further contend that the judge erred by precluding full development of their insurance fraud conspiracy theory and by refusing to allow evidence allegedly implicating Longobardi. Finally, they claim that evidence of Longobardi's teaching attendance record at Ramapo High School for June 1982 was improperly allowed.
In August 1982 Chubb issued a renter's or tenant's policy, including a personal articles floater ("P.A.F."), with coverage for antiques, fine art, and a Hummel collection owned by Longobardi. The loss came as a result of a burglary at Longobardi's rented home between April 6 and April 10, 1984 while he was out of town. At trial Longobardi testified that he was 46 years old, had 25 years of experience as a high school English teacher, and was currently employed at a senior high school in Spring Valley, New York, where he had been teaching *8 for about 18 years. He and members of his immediate family had been collecting fine art objects and collectibles for many years, such as antique furnishings, Hummels, paintings, jewelry and fine rugs.
Longobardi had been living in West Nyack, New York, where he had attempted to obtain renter's insurance for his collection with two insurance companies. Aetna Insurance Company (Aetna) had issued a policy to him with regular coverage, and additional coverage for his men's jewelry. Thereafter, by an April 6, 1982 letter, Aetna declined to continue coverage "due to the type of property and the high value."[2] Longobardi then tried to place insurance through a local agent for St. Paul Insurance Company (St. Paul). He showed the Aetna cancellation letter to the agent who then applied for coverage with St. Paul. Longobardi also obtained appraisals for his furnishings, fine art, and some major pieces of his men's jewelry.
St. Paul issued a general policy and a P.A.F. covering only the men's jewelry, not the fine art objects. Longobardi then applied for coverage for his fine art objects. His application was accepted. However, St. Paul notified Longobardi that it would not continue coverage unless he installed a burglar alarm system in the house and obtained locked cabinets for all of his valuable possessions. According to Longobardi, the cost of installing the burglar alarm system (reportedly $3,500) and purchasing locking cabinets was too expensive, especially since he was living in a rented house. As a result, St. Paul refused to provide the additional coverage. When the renewal came due the following year Longobardi decided to discontinue it because the premium had increased substantially.
*9 Around this time, July and August 1982, Longobardi moved from West Nyack to Closter, New Jersey, where he took up residence with his brother in a rented home. About a year later Longobardi consulted Arthur Parsells of the Parsells Insurance Agency in Closter regarding renter's insurance and coverage for his household possessions, including some jewelry, fine art objects and a Hummel collection. Parsells recommended a local jeweler to appraise Longobardi's jewelry collection and a couple of other appraisers to appraise the antiques and fine art collection. For the fine art collection Longobardi did not use the recommended appraisers, but obtained an appraisal from a firm known as "Appraisal and Estate Services."
Longobardi obtained the appraisal of his jewelry collection and returned to Parsells' office on August 12, 1983. Parsells recommended Chubb's renter's insurance policy with a personal articles floater to cover the jewelry. Parsells testified that he completed the application form based on Longobardi's answers to his questions and that Longobardi's signature was not required.
According to Parsells, Longobardi answered a question regarding employment by saying he was a professor. In response to an application question about prior insurance, Longobardi apparently indicated "Allstate, Harrisburg, Pennsylvania." Questions asking if he had been refused homeowner's or P.A.F. coverage within the last three years, or if coverage had been declined, cancelled or renewal refused within the last three years were answered in the negative.
On August 23, 1983, Chubb issued a policy which provided coverage in Schedule C for personal property under "Section 1  Property Coverages," and separate P.A.F. coverage. In October 1983 Parsells obtained additional coverage for Longobardi's fine art collection after appraisals were received. In December 1983 the policy was amended to include Longobardi's Hummel collection. The appraisal of the Hummels was done, *10 as suggested by Parsells, by Longobardi using a "1983 Hummel Guide" and performing the appraisal himself.
Parsells had gone to Longobardi's home in October 1983. He described it as reminding him of a museum with its fine collection of art objects. He testified that he had never seen such an extensive collection of Hummels.
On the weekend of April 6, 1984 Longobardi went "antiquing" on a trip with his parents to New Hope, Pennsylvania. Since his brother was on a business trip no one was home that weekend. Longobardi returned to Closter on the following Tuesday afternoon and discovered that his home had been burglarized. The police responded to his call and took a statement and photographs of the premises. Longobardi also notified Parsells, who subsequently went to the house and assisted in preparing a proof of loss. Longobardi noted that some items that had been taken had not been included on the appraisal listing such as "silver, some Hummels, some porcelains, VCR tapes, TV, jewelry, coins." He testified that the total value of the loss claimed, including some items belonging to his brother, was $232,592.50.
A claims adjuster from Chubb interviewed Longobardi about a week or so later and prepared a handwritten statement of the interview. He sent this statement to Longobardi who corrected the reference to his being an English professor. He was an English teacher, and had been an assistant professor when previously employed by a college for a short time. Longobardi also corrected the reference to Allstate as his previous insurance carrier to St. Paul. The statement, which he signed, also said that he had "never made application to any insurance company other than Chubb and Son for my fine arts collection or my Hummel collection."
In August 1984 Chubb asked Longobardi to submit to an examination under oath. During that examination Longobardi *11 denied knowing a Stephen Kitsakos and a Frank Isgro.[3] At trial, however, Longobardi admitted knowing both individuals. Longobardi knew Isgro from having taught in the same school with him for a number of years. Although not good friends, their friendship arose because Isgro was also interested in fine art. He had been introduced to Kitsakos by Isgro in or about 1980, and had been in Kitsakos' presence about four or five times. Kitsakos had done appraisals for him in 1982, when he lived in West Nyack. Longobardi had also purchased some fine art objects from Kitsakos. However, those items had not been stolen in the Closter burglary. Longobardi conceded that Kitsakos had come to his house and appraised some jewelry for him in 1982 when Longobardi lived in West Nyack and that these appraisals were used to obtain insurance from St. Paul. He subsequently picked up that appraisal at Isgro's home in Hasbrouck Heights where he met Kitsakos and Isgro and stayed for about 15 to 20 minutes to discuss the appraisal with Kitsakos. He used Kitsakos' appraisal of his Hummel collection to obtain additional coverage from St. Paul, although it was ultimately declined because he would not install a burglar alarm system. Longobardi also testified that he had purchased art objects from Kitsakos at Isgro's Pennsylvania home. He denied knowing that Isgro also did appraisals and denied giving them character references attesting to their reputation as appraisers, although his signature appeared on such references. Defense counsel read into evidence Longobardi's certification acknowledging that he had filled out a character reference form for Isgro because they taught at the same school, but stating that he had not given a reference for Kitsakos, who may have forged plaintiff's signature on another form.[4]
*12 Cross-examination disclosed some inconsistencies between the Hummels identified on the 1982 appraisal list prepared by Kitsakos and the Hummels that Longobardi said he owned at the examination under oath. Longobardi conceded that his statement at his examination under oath that he had never attempted to have his Hummel collection insured was not correct.
On further cross-examination Longobardi said that he had denied knowing Kitsakos in the examination under oath because he felt the examination had a "hidden agenda" and was "extremely accusatory." By that time (August 1984) he knew Kitsakos and his friends were "shady" and he did not want to be associated with them. He began "distancing" himself from them in 1982 because he had heard conversations among teachers at the school where he taught to the effect that they were involved in a number of insurance claims. He stated that he did not know what they were involved in until he subsequently received newspaper articles from the lawyer for defendants. He said he obtained new appraisals when he applied for insurance through Chubb because Kitsakos' appraisals seemed high.
On cross-examination by defense counsel, Parsells, the insurance agent, was asked what he would have done if he had been told, at the time Longobardi was applying for insurance, that coverage had been refused or cancelled within the last three years. Parsells answered that he could not have bound the coverage but would have had to call Chubb to discuss the situation or simply refuse coverage. He also said that if he had been told of the prior declining of coverage, and had seen the letter from Aetna this would have caused him to have reservations and he would have contacted Aetna about the specifics of the refusal. Coverage, however, would not have been rejected, *13 but he would have sent the letter along with the application to Chubb. As to the refusal of St. Paul to provide coverage without a burglar alarm system, Parsells testified that although he would have answered questions on the application differently, he would not have had to discuss this with Chubb since it did not require such a system.
Chubb presented Randall Quirk's testimony that in 1979 or 1980 he had lived in an apartment above Isgro in Hasbrouck Heights. Quirk subsequently became involved in an insurance fraud scheme with Kitsakos and Isgro. Quirk testified to his own involvement with Kitsakos and Isgro and his subsequent testimony against them under a plea agreement with the United States Attorney. Quirk never implicated Longobardi in any conspiracy and admitted that the first time he heard about the burglary at Longobardi's residence was in June 1987 when the insurance company told him about it during its investigation. Quirk claimed that he last saw Longobardi with Kitsakos or Isgro in June 1982 when they all were in a car when Quirk was going to see his attorney. After that he left New Jersey and did not return until this trial. Attempts by defense counsel to establish Longobardi's involvement in a conspiracy were rejected by the trial judge because there was no evidence of Longobardi being implicated. The judge limited Quirk's testimony to his personal knowledge of Longobardi and would not allow the witness to surmise from an association between Longobardi and others.
Annette Paolino, a supervisor in Chubb's underwriting department, testified that the purpose of the question relating to prior refusal of coverage to an applicant is to give Chubb the opportunity to find out about coverage unacceptable to another insurance company since insurance companies generally have the same standards for these types of policies. If potential coverage is unacceptable to one company it is generally unacceptable to another. She stated that if she knew that Longobardi had been refused coverage she would have contacted *14 Parsells and any named insurance company directly to further investigate.
There was also testimony by Beverly Ascolese, a special claims investigator for Chubb, who reviewed the handwritten statement prepared by Chubb's claims adjuster. Ascolese saw a discrepancy between the correction made to the statement that St. Paul had been his prior insurance company, and the reference to Allstate in the insurance application. She then contacted St. Paul which subsequently sent her appraisals submitted by Longobardi which had been prepared by Kitsakos. When Ascolese compared those appraisals with those submitted by Longobardi to Chubb she found that some of the property did not match. Specifically, she noted that the Kitsakos appraisals listed 138 Hummels while the appraisals submitted to Chubb listed only 52 or 53 Hummels. According to her, this was not consistent with Longobardi's statement that he was a collector and not a dealer since she would have anticipated that the number of Hummels would have stayed substantially the same if he was a collector. Other testimony was proffered concerning discrepancies between Kitsakos' appraisal list and the one submitted to Chubb. This testimony was essentially limited to the issue of the credibility of the handwritten statement submitted to Chubb.
Ascolese also testified that statements at Longobardi's examination under oath that he had never been refused, cancelled or non-renewed; had never had his fine art or Hummels appraised before; had never applied for insurance for those items before; and didn't know Kitsakos or Isgro (all of which were false statements) were material to her investigation.
In rebuttal, Longobardi testified that he did not know, and never met Quirk. He denied being in a car when Quirk went to retain an attorney in June 1982. He also testified that Kitsakos had not appraised all of his Hummels or fine art in 1982, and that some of the art objects were in storage at that time. Although on cross-examination Longobardi indicated that he *15 had not appraised all his Hummels when he applied for insurance with Chubb, in his examination under oath he did state that for purposes of obtaining the Chubb insurance he had appraised all the Hummels he had owned at that time.
In his instructions to the jury the trial judge defined the word material as "simply" meaning "pertinent or germane." He also referred to it as "being connected to, focusing upon ..." He gave the following instruction to the jury regarding the insurance company's affirmative defense of false swearing in the post-loss examination and written statement:
First of all, with regard to false swearing, there are three elements which compose that offense. First, an untruthful utterance; secondly; of a material fact; and (3) with the intent to cheat or deceive the insurance company.
Now, in this case, the defendant contends that the plaintiff in the course of the examination under oath conducted by the defendant with the plaintiff following the incident of April 10, 1984, uttered certain untruthful answers to questions posed in the course of that examination. Defendant further contends that with respect to a written statement furnished by plaintiff to defendant following a claim of loss, that the plaintiff again made certain untruthful statements, utterances, in that statement. It is the contention of the defendant that either some or all of the untruthful utterances of the plaintiff were material, and that those material misrepresentations were made in an effort to hinder, deflect or mislead the insurance company in the course of its investigative process.
If you find that the statements made by the plaintiff were extraneous or irrelevant to the defendants investigative process, then the fact that the plaintiff may have made some misstatements would not permit the defendant to avoid its obligation.
On the other hand, if you find that the statements made by the plaintiff in the course of the examination under oath and/or the written statement furnished by him to the defendant contained untruthful utterances which misled, hindered or deflected the ability of the insurance company to conduct its investigative process into the loss claim which was pursued by plaintiff, then you would have found that the plaintiff had in fact committed false swearing based upon the events that have occurred in this matter.
In other words, the application for a claim of loss predicated upon that set of facts, you could conclude from that that the plaintiff intended to cheat or deceive the defendant insurance company.
It is for you and you alone to decide and to determine the answer to that question.
The special interrogatories submitted to the jury, and its responses, follow:

*16 1. Did a burglary occur at the premises rented by plaintiff George Longobardi, Jr. located at # 83 Hickory Lane, Closter, New Jersey on April 10, 1984?
 Yes X No ____
NOTE: If you have answered question # 1 "YES" answer question # 2. If you have answered question # 1 "NO" cease your deliberations and return your verdict.
2. Did plaintiff George Longobardi, Jr. conspire with another or others to defraud defendant Federal Insurance Company by causing or consenting to a burglary of his rented dwelling home located at # 83 Hickory Lane, Closter, New Jersey on April 10, 1984?
 Yes X No ____
NOTE: If you have answered question # 2 "YES" cease your deliberations and return your verdict. If you have answered question # 2 "NO" answer question #3.
3. In its application for insurance, defendant Federal Insurance Company included the following question: "Has applicant been refused homeowner or PAF coverage within the last three (3) years?"
Do you find that the above question is:
 (A) Objective Yes X No ____
 (B) Subjective Yes ____ No ____
NOTE: If you have answered question # 3A above "YES" answer question # 4. If you have answered question # 3A "NO" and question # 3B "YES" do not answer # 4, but proceed immediately to answer question # 5.
4. Did plaintiff George Longobardi, Jr. make a material misrepresentation which was relied upon by defendant Federal Insurance company when plaintiff answered the question contained in the application for insurance set forth in interrogatory # 3 hereinabove?
 Yes X No ____
NOTE: If you have answered question # 4 "YES" cease your deliberations and return your verdict. If you have answered question # 4 "NO" proceed immediately to answer question # 6.
5. Did plaintiff George Longobardi, Jr. make a material misrepresentation with the intent to cheat, defraud, or deceive defendant, which was relied upon by defendant Federal Insurance Company when plaintiff answered the question contained in the application for insurance set forth in interrogatory # 3 hereinabove?
 Yes ____ No ____
NOTE: If you have answered question # 5 "YES" cease your deliberations and return your verdict. If you have answered question # 5 "NO" answer question #6.
6. Did plaintiff George Longobardi, Jr. make a material false statement during the examination under oath conducted by defendant, or the written statement made by plaintiff after April 10, 1984 in an effort to or for the purpose of *17 hindering, deflecting or misleading defendant in the course of its investigative process?
 Yes X No ____
NOTE: If you have answered question # 6 "YES" cease your deliberations and return your verdict. If you have answered question # 6 "NO" answer question #7.
7. Did plaintiff George Longobardi, Jr. make a material misrepresentation with the intent to cheat or defraud defendant Federal Insurance Company when stating in the Proof of Loss the amount of loss of his personal property as a result of the burglary which occurred on April 10, 1984?
 Yes ____ No ____
NOTE: If you have answered question # 7 "YES" cease your deliberations and return your verdict. If you have answered question # 7 "NO" answer question #8.
DAMAGES
8. What total sum of money would fairly and reasonably compensate plaintiff George Longobardi, Jr. for his losses and damages resulting from the burglary which occurred on April 10, 1984?
 $ ____
The jury never reached the last two questions because it answered question number six in the affirmative by a five to one vote. It had been unanimous on all of the preceding answers to the special interrogatories. There had been no objection by plaintiff's attorney to either the charge or any of the special interrogatories.

I
Longobardi now contends that interrogatory number six erroneously permitted the jury to conclude that his obligation after the loss was controlled by the insurance company's subjective interpretation of fraud and false swearing. Chubb responds by arguing that when taken into account with the judge's jury instructions, interrogatory number six accurately stated prevailing law and there was no error. Moreover, since plaintiff did not object to the wording of the interrogatory at the trial or any portion of the jury instruction, the issue must be reviewed under the plain error standard. R. 2:10-2.
*18 Because the subject insurance policy lacks any language regarding fraud or false swearing after the loss, and during the claim investigation period, Longobardi argues that the insurer is precluded from voiding the policy on that ground, he also contends that even if the insurer could rely on such a defense, it must prove that he intended to defraud the insurer, not merely hinder its investigation as indicated in interrogatory number six. Longobardi also argues that this interrogatory did not properly advise the jury on the fraud element of materiality, which he says must relate to Chubb's assumption of the risk or the claim of loss.
Longobardi further contends that the judge should not have even submitted interrogatory number six to the jury because his denial that he knew Kitsakos and Isgro was immaterial to the loss as a matter of law. He argues that the uncontroverted facts and the jury's finding that he was not involved in an insurance fraud conspiracy make any statements as to these individuals irrelevant to a false swearing issue during the claim proceedings.
The insurance policy here contained requirements for the insured to cooperate with it and protect the property from further loss, provide prompt notice of the loss, and submit a proof of loss within 90 days. The property loss portion of the policy dealing with P.A.F. coverage, which applied to the bulk of the loss here, provided:
7. Examination Under Oath. You agree:
A. to be examined under oath;
B. that employees, members of your household or others will be produced for examination under oath to the extent that it is within your power to do so;
C. to produce, if requested, the remains of the insured property; and
D. to produce such records as we may need to verify the claim and its amount; and to permit copies of such records to be made if needed.
The P.A.F. coverage portion of the policy also states:[5]

*19 Concealment of Fraud. We do not provide coverage for any insured who has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance.
The jury's response to the special interrogatories three and four made it clear that it found no material misrepresentation in the application process for the insurance policy. Longobardi's arguments on appeal go to the issue of false swearing committed during the claim process which occurred after the loss and, therefore, cases involving misrepresentation during the application process are not necessarily controlling authority.
Since the jury found no material misstatements in Longobardi's application for insurance we must determine if his misstatements after the loss relating to knowledge of Kitsakos and Isgro, as well as attempts at prior insurance coverage (although at a different location) were material facts relating to the insurance which were intentionally concealed or misrepresented so as to allow Chubb to disclaim all coverage. A subsidiary question is whether any concealed or misrepresented information prejudiced the insurer, and if not, whether the absence of prejudice affects the result.
In support of its defense Chubb refers for the first time on appeal to the New Jersey Insurance Fraud Prevention Act, N.J.S.A. 17:33A-1 et seq., which has as purposes:
... to confront aggressively the problem of insurance fraud in New Jersey by facilitating the detection of insurance fraud, eliminating the occurrence of such fraud through the development of fraud prevention programs, requiring the restitution of fraudulently obtained insurance benefits, and reducing the amount of premium dollars used to pay fraudulent claims. [N.J.S.A. 17:33A-2].
N.J.S.A. 17:33A-4 sets forth the circumstances under which a person violates the act, and provides in pertinent part:
a. A person or a practitioner, violates this act if he:
(1) Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim;
The act provides that "[a]ny insurance company damaged as a result of a violation of any provision of this act may sue ... to recover compensatory damages, which may include reasonable *20 investigation expenses, costs of suit and attorney's fees." N.J.S.A. 17:33A-7a. One of the act's legislative policies is to discourage false or misleading statements of material facts in support of a claim. However, aside from the fact that the statute was not relied on in the trial court, and hence need not be considered here, Nieder v. Royal Indemnity Insurance Co., 62 N.J. 229, 234 (1973), the act does not specifically void coverage for false statements after the loss, which in any event must be shown to be material.
Longobardi had a duty not to give his insurer false statements that would hinder the investigation of his loss. In considering the insured's duty under the policy we do so primarily in light of the language of the insurance contract. We also take into account the impact of the applicable legislation and the equities of the situation.
However, we must also consider whether the phrasing of interrogatory number six, in context with the instructions to the jury, constituted reversible error. The jury was instructed on the elements of false swearing: an untruthful utterance; a material fact; and intent to cheat or deceive the insurance company. The judge also instructed the jury that defendant had the burden of proof as to its affirmative defenses.
Some significant problems arise. There is no clear definition of materiality in either the insurance policy or the case law, particularly as to post-loss statements. Nor is there any applicable policy provision clearly directed at statements made after the loss. In addition, the concealment clause appears to refer to past instances when it states that no insurance is afforded to one who "has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance." This implies past action, that is, presumably prior to issuance of the policy, or at least prior to or contemporaneous with the loss.
The lack of adequate definition of materiality is a deficiency which generally permeates the reported cases both as to pre-loss and post-loss statements. Moreover, case law authority *21 inadequately distinguishes pre-loss and post-loss situations. Except for fraud in the origin or existence of a claim or loss, a misstatement would seem to have greater significance to the insurer when made before the policy is written. Even a misstatement of value can be resolved without a total disclaimer of any coverage. In addition to the uncertainty of the applicability of any specific policy provision, the trial judge too broadly defined materiality for the jury when he said it meant merely pertinent and germane. However, the jury's specific factual findings in answers to special interrogatories 1 through 4, make it clear that all fraudulent claim issues were resolved by the jury against the insurer.
On several occasions the trial judge instructed the jury that "material" merely meant "pertinent and/or germane." That instruction erroneously equated material with, and defined it as, what is "relevant," rather than material. "Relevant" in Webster's Third New International Dictionary, 1917 (1971) and Webster's Ninth New Collegiate Dictionary, 995 (1983) is defined to include "germane" and "pertinent"[6] as synonyms. In Black's Law Dictionary 1160 (5th ed. 1979) "relevant" is defined as "[a]pplying to the matter in question; affording something to the purpose." In addition, "relevant evidence" is broadly defined in Evidence Rule 1(2) and "means evidence having any tendency in reason to prove any material fact."
On the other hand, "material" is defined in this context as "having real importance or great consequences," although in a sense it is related to "relevant."[7]Webster's Ninth New Collegiate Dictionary 733 (1983). For something to be material, in the sense of importance to the issue, it must also be relevant. *22 The converse is not always true. Black's Law Dictionary, 880 (5th ed. 1979) defines "material" as:
Important; more or less necessary; having influence or effect; going to the merits; having to do with matter, as distinguished from form. Representation relating to matter which is so substantial and important as to influence party to whom made is `material.'
The jurors thus used a broader definition of material in considering and answering the special interrogatories. They ruled in Longobardi's favor on all the special interrogatories preceding number six, despite being given a definition of material which was more favorable to Chubb than was appropriate. Hence, there is no basis to disturb the jury's unanimous answers to special interrogatories numbers three and four. However, the erroneous definition of material had the clear capacity to result in a miscarriage of justice when applied by the jury to interrogatory number six. R. 2:10-2.
The judge's instructions did not explain in detail the intent requirement for after loss statements, particularly with reference to materiality. The inclusion of the phrase "for the purpose of hindering, deflecting or misleading" the insurer's investigation in interrogatory number six was not a substitute for a complete jury instruction on the post-loss aspect. Explaining to the jury that material simply meant "pertinent and/or germane" was not a sufficient statement of the law. The insurer had the burden of proving not only that Longobardi's false statements after the loss were material, in the sense of being important or significant to the origin or nature of the loss, but also that they resulted in prejudice to the insurance company.
Many of the reported property loss cases concern misrepresentations in the application for insurance. For instance, Kozlowski v. Pavonia Fire Insurance Co., 116 N.J.L. 194 (E. & A. 1936) involved misstatements before and after the loss and a policy provision covering fraud or false swearing "whether before or after a loss." Id. at 196. The court in upholding a jury verdict for the plaintiffs-insureds held that a misrepresentation *23 or concealment of a fact material to the risk made during the application process "must be tainted with a fraudulent purpose to deceive" in order to void the insurance policy. With regard to concealment, intent to deceive need only be shown if there is a concealment, other than by mere silence, related to a matter that was not the subject of a specific inquiry made by the insurance company. Id. at 196-197; see also Jerry V. Carbone, Inc. v. North River Insurance Co., 207 N.J. Super. 12, 17-18 (App.Div. 1986).
Chubb relies on Public National Bank of New York v. Patriotic Insurance Company of America, 105 N.J.L. 477, 482-483 (E. & A. 1929), to support its argument that false statements in the claim process constitute sufficient fraud to bar a claim. That case involved a loss under a fire insurance policy where the insurance company found from an examination of the claimant's records that the value of the lost property had been overstated. Id. at 479. The insured's explanation was that its books had been changed in order to inflate tax losses. The insurer refused to pay based on a policy provision against "fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss." Id. at 480 (emphasis supplied). One issue was whether the judge erroneously charged the jury, which found against plaintiff, that it was no excuse to a fraud and false swearing charge for the insured "to say that it did not mean thereby to prejudice the insurers but merely to promote its own interest in evading federal income taxes." This was held to be a proper charge under the policy language. Id. at 482.
The bank's argument that it was error for the judge not to have charged the jury that an insured could not be prevented from receiving its actual losses under the policy unless the insurer proved that the books or false statements were, in fact, "used with intent to prejudice the insurance companies" was rejected. The court concluded that the judge's instructions that "mere proof of facts that the books were improperly or falsely *24 kept is not sufficient to sustain this [false swearing] defense," was sufficient, id. at 482, and that:
`... The fraud or false swearing must be as to a fact or circumstance and must be material as to the rights and liability of the defendant companies; they must be willful and made with intent to misrepresent.' And again the court said: `The defendants here present what we call an affirmative defense of fraud and false swearing as a breach of the terms of the policy. The burden of proving this defense is upon the defendants. They must sustain it by a fair preponderance of the evidence.' [Id. at 483].
Public National Bank is distinguishable because the policy there specifically referred to after the loss statements. Moreover, the application of the rule in that case regarding prejudice seems unduly harsh where there has been a loss which the insurer had covered and which would in any event be limited to the value of the loss established. A strict application of such a broad principle tends to work inequitable results and forfeitures where there was no fraud involved in the loss, or even in the amount that would have been payable. See Kozlowski v. Pavonia Fire Insurance Co., supra, 116 N.J.L. at 198-199.
As we have observed, Chubb's policy's concealment of fraud provision is in the past tense and does not expressly refer to "after the loss" statements. Unlike cases such as Public National Bank, Chubb's insurance policy does not contain specific language regarding fraud or false swearing after the loss and during the claim investigation period.[8] There is no clear statement to the insured that coverage would not be provided for intentional misrepresentation of any material fact relating to the policy of insurance made after the loss, particularly if no fraud is established as to the claim and if there was no material hindering of the investigation.
*25 Construction of the language of an insurance policy, as other contracts, is essentially a question of law for the court. See Schultz v. Kneidl, 56 N.J. Super. 575, 581 (Law Div. 1959), aff'd. 59 N.J. Super. 382 (App.Div. 1960); Korb v. Spray Beach Hotel Co., 19 N.J. Super. 226, 230 (Law Div. 1952), aff'd, 24 N.J. Super. 151 (App.Div. 1952). Moreover, in construing the language of an insurance policy, a contract of adhesion, ambiguities are construed strictly against the insurer. Sparks v. St. Paul Insurance Co., 100 N.J. 325, 336 (1985); Meir v. New Jersey Life Insurance Co., 195 N.J. Super. 478, 487 (App.Div. 1984), aff'd 101 N.J. 597 (1985). There is no basis for us to change the policy language when the insurer was capable of inserting specific language to cover the after loss situation. See Boswell v. Travelers Indemnity Co., 38 N.J. Super. 599, 604-605 (App. Div. 1956).
The usual rules of construction require us to strictly construe the policy against the insurer and avoid forfeitures. Ruvolo v. American Casualty Co., 39 N.J. 490, 498 (1963); Mazzelli v. Accident & Casualty Insurance Co. of Winterthur, 35 N.J. 1, 8 (1961); Kievit v. Loyal Protective Life Insurance Co., 34 N.J. 475, 483 (1961); Matits v. Nationwide Mutual Insurance Co., 33 N.J. 488, 495 (1960); Aetna Insurance Co. v. Weiss, 174 N.J. Super. 292, 296 (App.Div. 1980), certif. den. 85 N.J. 127 (1980). The courts are bound to protect the insured to the full extent that any fair interpretation of the insurance policy will allow. Mazzelli v. Accident & Casualty Insurance Co., supra, 35 N.J. at 7; Aetna Insurance Co. v. Weiss, supra, 174 N.J. Super. at 296; Ruter v. Northwestern Fire & Marine Insurance Co., 72 N.J. Super. 467, 471 (App. Div. 1962), certif. den. 37 N.J. 229 (1962). The insurer must not only show a lack of cooperation by its insured, but an intentional concealment or misrepresentation which materially affected the loss. See Boswell v. Travelers Indemnity Co., supra, 38 N.J. Super. 599. Cases dealing with either statutes or policy provisions which specifically refer to "after the loss" misstatements are not controlling here.
*26 Certain cases deal with situations where the facts concealed went to establish that there was no coverage afforded under the policy. In Cummings v. Farmers Insurance Exchange, 202 Cal. App.3d 1407, 249 Cal. Rptr. 568 (1988), the policy covered misrepresentation of "any material fact or circumstance relating to this insurance, before or after the loss." Id. 249 Cal. Rptr. at 570 (emphasis supplied). There, the insured's concealment not only of the fact that her son (specifically an "insured" under the policy) was at home at the time of the loss, but also had committed the vandalism (there was no coverage for the insured's deliberate acts) was material as a matter of law. Id. 249 Cal. Rptr. at 573-574.
After the loss occurs the insured's duties are generally spelled out in policy clauses relating to cooperation with the insurer. Such clauses typically relate to assisting the insurer in defense of third-party claims made under the policy. The materiality of post-loss statements by the insured are in a different context since the insurer and its insured are in adversary positions when the insurer questions a claim. Thus, in Bryant v. Nationwide Mutual Fire Insurance Co., 67 N.C. App. 616, 313 S.E.2d 803, 808 (1984), affirmed in part and reversed in part, 313 N.C. 362, 329 S.E.2d 333 (1985), it was held under the applicable statute that "a misrepresentation during a loss investigation is material ... only when the misrepresentation prejudices the insurer." The court in Bryant pointed out that the insured's false statements did not prevent a prompt investigation by law enforcement officials or the insurer, nor did they relate to the loss amount or the origin of the fire. Since no prejudice to the insurer in its investigation by the insured's misrepresentations was found the order granting the insurer a new trial was reversed. 313 S.E.2d at 808.
5A Appleman, Insurance Law and Practice, § 3552 (1970) discusses cooperation clauses in the context of an examination under oath and states:
Of course, in an examination of the insured, only such matters are material as have a bearing on the insurance and the loss, and the insured is required only to *27 give the best information obtainable. An unintentional false statement would be no ground for forfeiture, although a contrary result would obtain if the act of the insured consisted of willful false swearing. In fact, this result may be affected by a statute, providing that no false statement should constitute a defense unless fraudulently made in connection with material facts and such as to mislead the insurer. Where the misstatement resulted merely from lack of information, no avoidance would result.
The refusal of the insured to answer to an immaterial matter, or inability to give certain information desired, would not preclude recovery. [Footnotes omitted].
Chubb relies on cases from other jurisdictions in arguing that interrogatory number six was appropriate. It cites Fine v. Bellefonte Underwriters Insurance Co., 725 F.2d 179 (2d Cir.1984), cert. den. 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 162 (1984), for the proposition that post-loss misrepresentations bar a claim. However, in Fine the insured contributed to or caused the fire losses in buildings which he rented to commercial tenants. The fire insurance policy contained specific language regarding post-loss misstatements. 725 F.2d at 181 n. 4. On the night of the fire the sprinkler systems in the buildings did not operate. Two buildings were destroyed, a third was damaged. Upon investigation the insurer discovered that the fire occurred during an extended cold spell and that its insured had decided to force out his existing tenants by lowering the heat. It concluded that the decision to lower the heat caused the sprinkler systems to freeze and be inoperable at the time of the fire. Id. at 180. The claim was denied because an investigation tended to establish a material breach of the protective maintenance clause or the increased hazard clause of the insurance contract.
The trial court in Fine found that if the sprinkler systems had functioned normally the fire would have been controlled. It also found that Fine had made false statements in his post-loss examination under oath, a violation of a specific after loss policy provision, and had instructed the superintendent to set the heat at a very low temperature. However, the judge concluded that the statements were not material. Id. at 182. The Second Circuit Court of Appeals held that the false statements *28 were clearly material, and that it was irrelevant whether the insurer "was ultimately able to muster sufficient evidence to prove its theory at trial." Id. at 182-183.
Fine is distinguishable based on the specific "after loss" policy language and the fact that the insured's actions contributed to the loss. Moreover, decisions of the Circuit Courts of Appeal are not binding on us. See Linden Motor Freight Co., Inc. v. Travelers Insurance Co., 40 N.J. 511, 518 (1963); State v. Reynolds, 166 N.J. Super. 570, 574 (Law Div. 1979).
Nevertheless, if we applied the reasoning in Fine v. Bellafonte Underwriters Ins. Co., supra, despite the distinctions, it might be argued that the insurer was investigating a conspiracy to defraud theory that might have resulted in denial of coverage. However, the issue was presented to the jury which found no material misrepresentation in Longobardi's application and no conspiracy to defraud.
It is undisputed that Longobardi had concealed or misrepresented certain facts in the post-loss examination with knowledge of their falsity. However, intent to deceive the insurer as a matter of law will not lightly be imposed. The misrepresentations must not only be material, but they must have been made with the knowledge of their falsity and to conceal the true origin and nature of the loss. Claflin v. Commonwealth Insurance Company, 110 U.S. 81, 95, 3 S.Ct. 507, 515, 28 L.Ed. 76, 82 (1884). Claflin stated that "[a] false answer as to any matter of fact material to the inquiry, knowingly and willfully made, with intent to deceive the insurer, would be fraudulent." It was there considered irrelevant that an insured may have concealed the information for a purpose other than to deceive the insurance company. 110 U.S. at 96, 3 S.Ct. 515, 28 L.Ed. at 82; Cummings v. Farmers Insurance Exchange, supra, 249 Cal. Rptr. at 574. But see Kozlowski v. Pavonia Fire Insurance Co., supra, 116 N.J.L. at 198-200.
*29 We must examine whether Longobardi's concealment at the post-loss examination under oath of his knowledge of individuals who thereafter were found guilty of conspiring to commit insurance fraud in an unrelated matter was material to Chubb's investigation of Longobardi's potential involvement in a conspiracy to defraud it, and if so, whether it was necessary for Chubb to establish prejudice. If Chubb had proven that Longobardi was involved in a conspiracy to defraud it, and that his theft loss was a product of that scheme, then the insurer could deny coverage. However, Chubb was unable to do so as evidenced by the jury's finding that plaintiff was not involved in such a conspiracy. Kozlowski v. Pavonia Fire Insurance Co., supra, 116 N.J.L. at 198.
In its defense of false swearing after the loss, Chubb had the burden of proving under its policy that Longobardi's statements were material and made with the intention of "concealing or misrepresenting any material fact or circumstance relating to this insurance," and subject to governing law. From our review of the record it appears that the post-loss concealment of: (1) knowledge of two individuals who were not shown to have had anything to do with the origin or nature of the loss; (2) Longobardi's application to other insurers before he applied to Chubb, and (3) questions regarding prior applications for insurance for his Hummel collection, were arguably not material to the insurance loss here as a matter of law.
This would be because Chubb failed to establish a conspiracy to defraud it, let alone Longobardi's involvement in such a conspiracy. The trial judge concluded that because Chubb had not proven the existence of a conspiracy it could not implicate Longobardi in a conspiracy merely by association with individuals charged with crimes relating to insurance claims on another occasion.
In cases where it was held that the insured's misrepresentations were material to the investigation of the claim, the insured's misrepresentation or concealment generally related to *30 matters directly bearing on a defense of the insurer which was found to exist. For example, in Claflin v. Commonwealth Insurance Company, the insured gave false information relating to the manner in which he paid for the destroyed goods. 110 U.S. at 93-94, 3 S.Ct. at 513-15, 28 L.Ed. at 80-81. This bore directly on the question of whether there was an insurable interest in such goods. Id. at 94-95, 3 S.Ct. at 514-15, 28 L.Ed. at 82. Likewise, in Cummings v. Farmers Insurance Exchange, the insured's concealment of the fact that her son was not home and that it was he who vandalized the house, bore directly on a specific exclusion of coverage contained in the policy for deliberate acts of an insured. 249 Cal. Rptr. at 573-574.
In the instant case, Longobardi's post-loss concealment of knowledge of two individuals accused of insurance fraud unrelated to his claim did not affect or mislead Chubb's defense based on potential conspiracy. It was material to investigation of a conspiracy. Chubb was required to establish not only the existence of such a conspiracy, but also Longobardi's involvement in it. Merely because Longobardi had known individuals later found to have been involved in fraudulent claims is hardly competent proof to establish involvement in a conspiracy to defraud Chubb.
Had Longobardi answered truthfully at the examination under oath it would only have confirmed Chubb's existing knowledge that he knew and was associated at one time with Kitsakos and Isgro. Clearly, this information alone would not have been sufficient to prove a conspiracy existed as it shows no evidence of an agreement among those individuals. It also would not have opened up any new avenue of investigation as it is apparent that at the examination under oath Chubb already was aware of and perhaps suspicious of Longobardi's past association with those individuals. Therefore, as a matter of law Chubb has not carried its burden of proof in establishing that Longobardi's concealment of his past association with *31 those individuals was both material to its investigation into the possible existence of a conspiracy to defraud it on this claim and that it was prejudiced. We think the latter requirement must be of correlative importance, particularly as to post-loss statements. To hold otherwise would be akin to attributing to Longobardi his participation in a conspiracy by mere past association with individuals later found to have been involved in insurance fraud on different occasions, without proof that a conspiracy ever existed. This the law does not permit. See Hill Dredging Corp. v. Risley, 18 N.J. 501, 541 (1955); Sokolay v. Edlin, 65 N.J. Super. 112, 129-130 (App.Div. 1961).
Hence, withholding of knowledge of Kitsakos and Isgro, both of whom the insurer by that time knew had been accused of being involved in some other fraudulent insurance not involving Longobardi's claim, even if it might have been "material" in the insurance application aspect[9] or the origin or nature of the loss, was not "material" in the after loss statement because the concealment provisions of the policy did not clearly refer to such statements, and the insurer was not prejudiced thereby. Annotation, 13 A.L.R. 4th 837 (1982) (discussing prejudice to insurer by misstatements).
We hold that even a material misrepresentation after the loss would have to be shown to be prejudicial. Even if the post-loss misstatements were material, no prejudice existed here where the insurer already possessed full knowledge of the prior association. To hold otherwise would encourage an insurer, after the loss, to continually attempt to question its insured in the hope of obtaining misstatements.
*32 With respect to Longobardi's concealments made after the loss regarding his prior insurance or attempts at obtaining insurance with other insurance companies when he lived in New York, it can hardly be said that they materially hindered the post-loss investigation of the claim.[10] We note that except for the investigator's assertion that Longobardi's misrepresentations were material, there is nothing to demonstrate just how the false statements prejudiced Chubb's investigation. Moreover, the insurance agent who sold Longobardi the subject policy had testified that even if he had known of prior attempts at seeking insurance coverage that would not have necessarily have led to a rejection of coverage by Chubb. Thus, it is difficult to see how a post-loss concealment of prior attempts at obtaining coverage could have materially impacted Chubb's post-loss investigation or prejudiced its ability to defend against a claim on the policy by its own insured, particularly where no fraud or conspiracy was established in the application or the loss. We conclude, therefore, as a matter of law that Longobardi's post-loss statements regarding prior insurance did not materially interfere with or prejudice Chubb's investigation of the claim.
Other than conclusory testimony by Chubb's claims investigator that plaintiff's false statements were material to her investigation of the claim, the record reveals no evidence to support a finding that the withholding of the names of Kitsakos and Isgro had any purpose other than to confirm plaintiff's known association with them, and no indication that his post-loss statements prejudiced the insurer's investigation in any way. Obviously, Chubb already had the names of Kitsakos and Isgro, and apparently suspected a connection between them and Longobardi or it never would have raised or pursued an inquiry into his association with those individuals. Longobardi's misstatement as to Kitsakos and Isgro had not prevented Chubb *33 from uncovering those names, nor did it prevent it from attempting to establish the existence of a conspiracy.
In Golden v. Northwestern Mutual Life Insurance Co., 229 N.J. Super. 405, 421 (App.Div. 1988), we noted that assertions by the insurance company after the loss to the effect that it would have rejected the policy application or that a misstatement was material are easily made. Such assertions do not necessarily establish materiality.
Thus, even if the post-loss misrepresentations were considered material under the policy terms, there was no prejudice shown to have resulted to Chubb by Longobardi's post-loss misstatements; no showing that there was any information not available to it after the loss; and no proof that Longobardi intended to defraud Chubb by such statements. See Kozlowski v. Pavonia Fire Insurance Co., supra, 116 N.J.L. at 198; Broderson v. U.S. Fire Insurance Co., 113 N.J.L. 504, 505-506 (E. & A. 1934).

II
We turn now to Chubb's cross-appeal. It asserts that the trial judge erred by refusing to allow Chubb's former underwriter, Annette Paolino, to testify as to what action she would have taken with the knowledge of the undisclosed information from St. Paul about Longobardi's prior attempt to insure his fine art and Hummels and St. Paul's reasons for refusing the requested coverage. Chubb argues that the error was compounded when the judge failed to charge the jury that the false statements contained in the policy application were material as a matter of law.
Plaintiff had initially obtained coverage with St. Paul under a general renter's policy, which included a personal articles floater covering his jewelry, fine art and Hummel collections. He was subsequently notified, in September 1982, that due to the *34 large inventory of Hummels he owned and the fact that he had not installed a burglar alarm system, St. Paul would be unable to continue the coverage on his Hummel collection. St. Paul, however, continued to provide coverage under the renter's policy and the jewelry floater until about one year later when plaintiff decided to cancel the policy due to the high premiums. The jury could reasonably have found that Longobari had not been refused or denied coverage based on these facts.
At trial Paolino had testified that she was only involved in reviewing plaintiff's initial applications to Chubb for the general renter's policy and the jewelry floater. Based upon these applications Paolino approved plaintiff for these specific coverages. As noted earlier the personal articles floater portion of the policy was twice amended to include additional coverage for plaintiff's fine art and Hummels. Apparently, by the time these amendments were made to the P.A.F., Paolino was no longer employed by Chubb.
Defense counsel attempted to elicit testimony from Paolino as to what she would have done had she known at the time of his application that Longobardi had previously tried to insure his fine art and Hummels with St. Paul. Plaintiff's attorney objected on the ground that the witness was not competent to answer the question since she was not involved in the review and approval of the fine art and Hummel coverage. The objection was sustained because Paolino took no part in the underwriting of the fine art or the Hummels and she was thus considered not competent to testify with respect to the issuance of that portion of the policy.
We find no reversible error in the judge's rulings. Paolino was neither formally qualified as an expert witness nor, as the trial judge found below, did she possess any personal knowledge about the specific subject of inquiry, namely the review and approval of the fine art and Hummel coverage. Evid.R. 19, *35 Comment 1; see State v. Vasky, 218 N.J. Super. 487, 491-492 (App.Div. 1987). Her testimony, if permitted, would have produced mere self-serving, after the fact, conclusions regarding matters in which she took no part. The trial judge did not abuse his discretion in precluding the admission of this testimony.
Moreover, such testimony had already been elicited from Parsells, the insurance agent who sold Longobardi the subject coverages. He testified as to what he would have done if he had known Longobardi had been previously refused coverage and stated that this would not have necessarily resulted in a rejection of coverage by Chubb. Thus, there was at best a question of fact as to whether the challenged statements in Longobardi's insurance application were material. The jury could have concluded from Parsells' testimony that notwithstanding Longobardi's prior insurance history the insurance coverage would have been issued anyway. Chubb's argument that Paolino's testimony, if allowed, would have necessarily resulted in a determination that plaintiff's misrepresentations would have been material as a matter of law, is without merit. Cf. Golden v. Northwestern Mutual Life Insurance Co., supra, 229 N.J. Super. at 421. Furthermore, the jury found that there had been no material misrepresentation as to prior insurance in the application process.
We also find no merit in defendant's argument that the trial judge committed reversible error by refusing to admit into evidence two letters from the Kirschner-Bryant Insurance Agency regarding cancellation, or perhaps more accurately termination, of plaintiff's fine art and Hummel coverage by St. Paul. These letters were offered for the truth of their contents and were, therefore, subject to the hearsay exclusion. Evid.R. 63. The trial judge did not abuse his discretion by refusing to admit them into evidence.
*36 We further reject defendants' argument that the trial judge erred in preventing them from fully developing and introducing at trial evidence concerning Longobardi's participation in a conspiracy to defraud the insurance company. We have previously concluded that such testimony was appropriately excluded.
Finally, defendants argue that the trial judge improperly admitted into evidence Longobardi's June 1982 attendance record at Ramapo High School. This record was proffered to rebut Quirk's testimony that plaintiff was with him in June 1982 when he went to retain an attorney. The trial judge found that the witness through whom the attendance record was offered was a teacher employed by Ramapo High School since 1976 who had access to teacher's records at that high school. Although this teacher sought to obtain the original record from the school's central file system, she could only obtain a copy because the school would not release the original. The record was maintained in the school's files and was kept in the ordinary course of business. It was admissible under either Evid. R. 63(13) or 63(15) and was the best record available under the circumstances. Admission of the copy was based on the judge's determination that plaintiff had satisfactorily demonstrated that the attendance record "was not procurable by the proponent by use of the Court's process or by other available means," Evid. R. 70(1)(b), since this was a record kept by the East Ramapo Central School District which is located in New York State. The judge's findings and conclusions are supported by sufficient credible evidence in the record. We find no basis to disturb his ruling in that regard.
The judgment in favor of defendant is reversed and the matter is remanded for trial on the issue of damages, including any defense that there were material misrepresentations of the amount of the loss.
NOTES
[1] Federal is a subsidiary of Chubb & Sons, Inc. which is affiliated with Chubb Insurance Company of New Jersey. For convenience, in general we will refer to the insurer as Chubb.
[2] The letter focused on his jewelry, and stated: "Unfortunately, our experience indicates that men, as a group, have more losses with their jewelry than women. On smaller items (under $2,000) we usually `take a chance.' However, due to the type of property and the high value, we'll be unable to continue this policy."
[3] These two individuals were indicted sometime in 1985 for insurance fraud in 1980. They were convicted on March 21, 1986.
[4] The Character Reference Returns for the International Society of Appraisers were dated respectively August 25, 1982 and June 17, 1982. In response to a question regarding length of time the applicant was known there was written in "6 years" on each form. The association with the applicant was marked as "professional" and the space next to "personal" was left blank. The only other writing on the forms in evidence, besides signature and date, was the comment on Isgro's form: "Highest degree of Professionalism."
[5] Similar provisions were contained in the basic policy.
[6] "Pertinent" is defined as synonymous with "relevant." Webster's Ninth New Collegiate Dictionary 878 (1983).
[7] It is neither useful nor helpful to say in the post-loss situation that "material" should be defined differently if equitable, rather than legal fraud is asserted. See Johnson v. Metropolitan Life Ins. Co., 53 N.J. 423, 437-438 (1969). Nor has that been asserted on this appeal.
[8] See also Cummings v. Farmers Insurance Exchange, 202 Cal. App.3d 1407, 249 Cal. Rptr. 568 (1988). Nor do our statutes specifically refer to fraud after the loss as some other state statutes do. See e.g. Bryant v. Nationwide Mutual Fire Insurance Co., 67 N.C. App. 616, 313 S.E.2d 803, 808 (1984), affirmed in part and reversed in part on procedural grounds, 313 N.C. 362, 329 S.E.2d 333 (1985).
[9] There was no question asked in the application process as to either Kitsakos or Isgro. Nor was there any requirement or need for their names to be disclosed at any time prior to the loss. Indeed, without evidence of a conspiracy it is troublesome why such a question would be asked except as an accusation. Would the insurer not have sold insurance to anyone who knew those two individuals?
[10] We again note that the jury had concluded that there had been no material misrepresentation by Longobari in the application process.