582 A.2d 1257

GEORGE E. LONGOBARDI, JR., PLAINTIFF–RESPONDENT, v. CHUBB INSURANCE COMPANY OF NEW JERSEY, CHUBB & SON, INC., AND FEDERAL INSURANCE COMPANY, DEFEN- DANTS–APPELLANTS.

Argued September 24, 1990—Decided December 18, 1990.

*Harry Robinson, III* argued the cause for appellants (*Gennet and Kallmann,* attorneys).

*Leo B. Mazer* argued the cause for respondent.

*Elmer M. Matthews* submitted a brief on behalf of *amicus curiae,* American Insurance Association.

The opinion of the Court was delivered by

POLLOCK, J.

This case requires us to determine whether an insured's post-loss misrepresentation to his personal-property insurer justifies its denial of coverage. Based on a jury finding that the insured, George E. Longobardi, Jr. ("Longobardi" or "the insured"), had made such misrepresentations, the Law Division dismissed his complaint against the insurers, Chubb Insurance Company of New Jersey, Chubb & Son, Inc., and Federal Insurance Company (collectively referred to as "Chubb" or "the insurer"). The Appellate Division reversed and remanded, holding that a post-loss misstatement allows an insurer to avoid liability only if the insured made the misstatement with fraudulent intent, the misstatement meets a stringent test of materiality, and the insurer was in fact prejudiced. 234 *N.J.Super.* 2, 560 *A.*2d 68 (1989). We granted certification, 118 *N.J.* 178, 570 *A.*2d 949, and now reverse the judgment of the Appellate Division and reinstate the judgment of the Law Division. We hold that when an insurance policy clearly states that material misrepresentations will void the policy, the insurer need not pay the insured for an alleged loss if the insured makes a material misrepresentation to the insurer while it is investigating the claim.

-I-

For years Longobardi had collected objects of art, including a collection of Hummel figurines. Before insuring his collection with Chubb, he tried to insure it with two other insurance companies. At one point, Aetna Insurance Company (Aetna) issued a renter's policy with a personal articles floater. Later Aetna declined to continue coverage "due to the type of property and the high value," referring to Longobardi's jewelry. Longobardi then secured coverage from St. Paul Insurance Company (St. Paul), which issued a renter's policy and a "floater" covering plaintiff's jewelry. Later St. Paul insured part of Longobardi's fine-art and Hummel collections. He provided St. Paul with appraisals he had obtained from Steven Kitsakos, to whom he had been introduced by Frank Isgro, a fellow teacher at the high school where Longobardi taught English.

St. Paul subsequently notified Longobardi that it would not continue coverage on the Hummel figurines, but continued the renter's policy and the floater on the men's jewelry. On renewal, St. Paul increased the premium, and Longobardi discontinued the policy.

Through an insurance agent, plaintiff obtained a policy from Chubb in 1983. The policy contained a "concealment or fraud" provision that stated:

*Concealment or Fraud:* We do not provide coverage for any *insured* who has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance.

In early April 1984, Longobardi's home was burglarized while he was out of town. He reported the burglary to the police department and to the insurance agent. Thereafter, he submitted to the police a list of missing jewelry, fine-art objects, and Hummel figurines. About a week later, a Chubb claims adjuster interviewed Longobardi. Subsequently, Longobardi submitted a signed statement averring that he had "never made application to any insurance company, other than Chubb & Son, for my fine arts collection or my Hummel collection." This

statement was false, as he had previously applied to St. Paul for such insurance.

On August 27, 1984, plaintiff submitted to an examination under oath conducted by Chubb's attorneys. He denied that he knew Kitsakos and that Kitsakos had ever provided him with a written appraisal. He also denied knowing Isgro. When Chubb's attorney confronted him with the fact that Isgro taught at Longobardi's school, Longobardi admitted that he knew of Isgro but stated that he did not know him personally. Those statements were false. In fact, Longobardi knew both men personally, and Isgro had introduced Longobardi to Kitsakos. Furthermore, Kitsakos had appraised Longobardi's collection in connection with the St. Paul application.

Longobardi further lied in denying that he had ever attempted to insure or had ever insured his Hummel figurines with St. Paul. He also lied by denying that he had ever had appraisals performed on the Hummel or fine-art collections before obtaining the appraisals submitted to Chubb. Longobardi sought to excuse those lies by saying that he felt Chubb had an accusatory "hidden agenda" at the examination and that he wanted to disassociate himself from Kitsakos and Isgro, whom he had come to consider "shady."

Chubb had good reason to be concerned about Longobardi's connection with Kitsakos and Isgro. To its knowledge, Kitsakos and Isgro had been involved in a series of schemes, for which they were later convicted of insurance fraud. The fraud consisted of preparing phony appraisals for procuring insurance on jewelry, fine art, and Hummel figurines. Kitsakos and Isgro would then assist the insureds in staging bogus burglaries to collect on the insurance. According to Chubb, it had already been "hit" with one of those fraudulent claims.

Chubb declined payment on Longobardi's policy. Longobardi then sued Chubb, seeking compensatory and punitive damages. Chubb denied liability on the policy, and asserted as an affirmative defense that Longobardi had made material misrepresenta-

tions of fact during his examination under oath. It also denied that a burglary had taken place, and asserted that Longobardi had made material misrepresentations in his application for insurance.

The jury found in answer to special interrogatories that Longobardi had been burglarized and had not conspired to defraud the insurance company. It further found that in his application for insurance, Longobardi had not made a material false statement. The jury found, however, that he had made "a material false statement during the examination under oath conducted by defendant, or the written statement * * * in an effort to or for the purpose of hindering, deflecting or misleading defendant in the course of its investigative process." Based on the jury's finding that Longobardi had made a material post-loss misstatement, the Law Division dismissed the complaint.

The Appellate Division reversed, entered a judgment on liability for Longobardi, and remanded for trial on damages. 234 *N.J.Super.* at 36, 560 *A.*2d 68. Finding the "concealment or fraud" clause ambiguous, the court construed the ambiguity in favor of coverage. *Id.* at 25, 560 *A.*2d 68. Further, the Appellate Division stated that a statement is material not if it is merely pertinent or germane, as the trial court stated in its charge, but only if it has "real importance or great consequences." *Id.* at 21–22, 560 *A.*2d 68. The court stated that Chubb could be excused from paying Longobardi only if his misrepresentations were prejudicial. *Id.* at 31, 560 *A.*2d 68. It then determined that Longobardi's misstatements were neither material nor prejudicial. Contrary to the Appellate Division, we find the policy not to be ambiguous, the insured's misstatements to be material, and proof of prejudice unnecessary.

-II-

Because of the jury's finding that Longobardi had not made a material false statement in his application for insurance, the

only ground for denying coverage is his misstatements in the post-loss investigation.

-A-

█ We begin with an overview of the fundamental rules for interpreting insurance policies. As contracts of adhesion, such policies are subject to special rules of interpretation. *Meier v. New Jersey Life Ins. Co.*, 101 *N.J.* 597, 611, 503 *A.*2d 862 (1986). Thus, we have said that "policies should be construed liberally in [the insured's] favor to the end that coverage is afforded 'to the full extent that any fair interpretation will allow.'" *Kievit v. Loyal Protective Life Ins. Co.*, 34 *N.J.* 475, 482, 170 *A.*2d 22 (1961) (quoting *Danek v. Hommer*, 28 *N.J.Super.* 68, 76, 100 *A.*2d 198 (App.Div.1953), *aff'd*, 15 *N.J.* 573, 105 *A.*2d 677 (1954)). Notwithstanding that premise, the words of an insurance policy should be given their ordinary meaning, and in the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability. *Brynildsen v. Ambassador Ins. Co.*, 113 *N.J. Super.* 514, 518, 274 *A.*2d 327 (Law Div.1971); *see also Weedo v. Stone–E–Brick, Inc.*, 81 *N.J.* 233, 247, 405 *A.*2d 788 (1979) (ambiguity genuine if "phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage"). Although courts should construe insurance policies in favor of the insured, they "should not write for the insured a better policy of insurance than the one purchased." *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 116 *N.J.* 517, 529, 562 *A.*2d 208 (1989).

█ With these principles in mind, we turn to the interpretation of the subject "concealment or fraud" clause, which mandates forfeiture by an *"insured* who has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance." Because the law disfavors forfeitures, *Hampton v. Hartford Fire Ins. Co.*, 65 *N.J.L.* 265, 267, 47 *A.* 433 (E. & A. 1900), such clauses should be construed if possible to sustain coverage.

■ Before the 1980's, "concealment or fraud" clauses in New Jersey tracked the language of the standard fire policy mandated by *N.J.S.A.* 17:36–5.20, which provided:

This entire policy shall be void if, whether before or after a loss, the insured had wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

"Plain language" legislation now requires that insurance policies be "simple, clear, understandable and easily readable * * *." *N.J.S.A.* 56:12–2. Underlying that requirement is the legislative judgment that the average insured can better understand his or her policy if it avoids confusing cross-references, excessively lengthy sentences, exceptions to exceptions, and words that are either obsolete or have a legal meaning different from their common meaning. *N.J.S.A.* 56:12–1c; *N.J.S.A.* 56:12–2; *N.J.S.A.* 56:12–10. Consequently, current "concealment or fraud" clauses, such as the subject clause, tend to be shorter and simpler than those formerly mandated by the statutory standard fire policy. Part of the price for simplicity is the absence of a phrase to cover every contingency.

■ Although we have not previously considered the issue, we agree with those courts that have concluded that "concealment or fraud" clauses apply when an insured misrepresents facts to the insurer that is investigating a loss. *Sales v. State Farm Fire & Casualty Co.*, 849 *F.*2d 1383 (11th Cir.1988); *American Employers' Ins. Co. v. Taylor*, 476 *So.*2d 281 (Fla. Dist.Ct.App.), *cause dismissed without opinion sub nom. Taylor v. American Employers' Ins. Co.*, 485 *So.*2d 426 (Fla.1985); *State Farm Fire & Casualty Co. v. Jenkins*, 167 *Ga.App.* 4, 305 *S.E.*2d 801 (1983). *But see Wendel v. State Farm Fire & Casualty Co.*, 435 *So.*2d 284 (Fla.Dist.Ct.App.1983), *pet. for rev. denied*, 447 *So.*2d 888 (Fla.1984) (rejected in *American Employers' Ins. Co., supra*, 476 *So.*2d at 283). Under standard fire policies that expressly applied to misrepresentations "whether before or after a loss," courts from sister states have declared policies void when the insured made post-loss misrep-

resentations to the insurer. *Long v. Insurance Co. of N. America,* 670 *F.*2d 930, 933 (10th Cir.1982); *Jenkins, supra,* 167 *Ga.App.* at 5, 305 *S.E.*2d at 802. Even when the policy did not expressly so state, however, courts have voided policies for post-loss misrepresentations. *Sales,* for example, involved a "concealment or fraud" clause virtually identical to Chubb's clause. The provision in *Sales* read: *"Concealment or Fraud. This entire policy shall be void if any insured* has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance." 849 *F.*2d at 1385. Applying Georgia law, the Eleventh Circuit held that "the word 'has' does not limit the 'fraud' provision to fraud which occurred in the application for insurance." Rather, the provision also applies "to concealment or misrepresentation in proofs of loss and other statements." *Id.* at 1386 (citing *Goldberg v. Provident Washington Ins. Co.,* 144 *Ga.* 783, 790, 87 *S.E.* 1077, 1079–80 (1916); *Jenkins, supra,* 167 *Ga.App.* at 5–6, 305 *S.E.*2d at 802–03). Similarly, the court in *American Employers' Insurance Co.* held that a fraud clause applied to a misrepresentation made after a loss: "It plainly states that the intentional concealment or misrepresentation of *any* material fact relating to the insurance will void the policy. As AE so succinctly puts it, any means any." 476 *So.*2d at 283. We agree.

When an insurer clearly warns in a "concealment or fraud" clause that it does not provide coverage if the insured makes a material misrepresentation about any material fact or circumstance relating to the insurance, the warning should apply not only to the insured's misrepresentations made when applying for insurance, but also to those made when the insurer is investigating a loss. Such misrepresentations strike at the heart of the insurer's ability to acquire the information necessary to determine its obligations and to protect itself from false claims. Thus, an insured's commitment not to misrepresent material facts extends beyond the inception of the policy to a post-loss investigation.

540

-B-

For an insurer to void a policy because of a post-loss misrepresentation, the misrepresentation must be knowing and material. A mere oversight or honest mistake will not cost an insured his or her coverage; the lie must be wilful. *Claflin v. Commonwealth Ins. Co.*, 110 *U.S.* 81, 95–97, 3 *S.Ct.* 507, 515–16, 28 *L.Ed.* 76, 82 (1884); *Public Nat'l Bank of New York v. Patriotic Ins. Co. of America*, 105 *N.J.L.* 477, 482–83, 144 *A.* 566 (E. & A. 1929); *Couch on Insurance 2d* § 49A:66 at 580–81, § 49A:67 at 582–83 (Rev. ed. 1982); *see also N.J.S.A.* 17:33A–4a(1) (proscribing knowing misrepresentations by insured in presentation of claims). The insured's motive for lying, however, is irrelevant. Forfeiture does not depend on proof that an insured harbored an intent to recover proceeds to which he or she was not entitled. An insurer may refuse payment if an insured wilfully misrepresented material facts after a loss, even if the insured did not harbor such an intent. *Claflin, supra,* 110 *U.S.* at 96–97, 3 *S.Ct.* at 516, 28 *L.Ed.* at 82; *Public Nat'l Bank of New York, supra,* 105 *N.J.L.* at 482–83, 144 *A.* 566. Consequently, it does not avail insureds to lie for reasons that appear to them to be sufficient. Not every knowingly false statement made by an insured, however, will relieve an insurer of its contractual obligations. Rather, forfeiture results only when the fact misrepresented is material.

Here, when charging the jury, the trial court stated that "[t]he word 'material' simply means pertinent and/or germane * * * being connected to, focusing upon." Longobardi's counsel did not object to the charge. Consequently, our review is limited to determining whether the definition, if erroneous, had the clear capacity to result in a miscarriage of justice. *R.* 2:10–1.

The Appellate Division found that the charge had that capacity. It held that material means "important or significant to the origin or nature of the loss" and that the misrepresentation must have "resulted in prejudice to the insurance company."

234 *N.J.Super.* at 22, 560 *A.*2d 68. Reviewing Longobardi's misstatements by that standard, the court found them not to be material. In reaching that result, the court examined Longobardi's misstatements in hindsight. *Id.* at 28–30, 560 *A.*2d 68. The court reasoned that inasmuch as Chubb had failed to establish that Longobardi was involved in a conspiracy with Kitsakos and Isgro, Chubb's inquiry into his association with them was immaterial.

■ We disagree with that analysis for several reasons. Materiality should be judged as of the time when the misrepresentation is made. In hindsight, the significance of an untruth may turn out to be greater or less than expected. Hindsight, however, is irrelevant to the materiality of an insured's misrepresentation to an insurer.

In this regard, we agree with the Second Circuit Court of Appeals, which stated in a similar case:

> The issue is: Is a false statement material only if it relates to a matter or subject which ultimately proves to be decisive or significant in the ultimate disposition of the claim, or is it sufficient that the false statement concerns a subject reasonably relevant to the insurance company's investigation at the time? The law is clear that the materiality of false statements during an insurance company investigation is not to be judged by what the facts later turn out to have been. The purpose of a provision requiring an insured to submit to an examination under oath is to enable the insurance company to acquire knowledge or information that may aid it in its further investigation or that may otherwise be significant to the company in determining its liability under the policy and the position it should take with respect to a claim. Thus the materiality requirement is satisfied if the false statement concerns a subject relevant and germane to the insurer's investigation as it was then proceeding.
>
> [*Fine v. Bellefonte Underwriters Ins. Co.*, 725 *F.*2d 179, 183 (1984), *cert. denied*, 474 *U.S.* 826, 106 *S.Ct.* 86, 88 *L.Ed.*2d 70 (1985).]

The *Fine* court went on to hold that

> [f]alse sworn answers are material if they might have affected the attitude and action of the insurer. They are equally material if they may be said to have been calculated either to discourage, mislead or deflect the company's investigation in any area that might seem to the company, at that time, a relevant or productive area to investigate.
>
> [*Id.* at 184.]

■ The right rule of law, we believe, is one that provides insureds with an incentive to tell the truth. It would dilute that

incentive to allow an insured to gamble that a lie will turn out to be unimportant. The focus, therefore, should be on the time when the insured is about to let loose the lie. An insured's misstatement is material if when made a reasonable insurer would have considered the misrepresented fact relevant to its concerns and important in determining its course of action. *See Claflin, supra,* 110 *U.S.* at 95–97, 3 *S.Ct.* at 515–16, 28 *L.Ed.* at 82; *Fine, supra,* 725 *F.*2d at 182–84; *Long, supra,* 670 *F.*2d at 934; *Cummings v. Farmers Ins. Exch.,* 202 *Cal.App.*3d 1407, 1416–17, 249 *Cal.Rptr.* 568, 573 (1988); *Allison v. State Farm Fire & Casualty Co.,* 543 *So.*2d 661, 663–64 (Miss.1989). In effect, materiality should be judged according to a test of prospective reasonable relevancy.

In this case, the Appellate Division also erred by holding that an insured's misrepresentation during the investigation of a loss is material only if it prejudices the insurer. 234 *N.J.Super.* at 26, 32, 560 *A.*2d 68. We believe the better rule is one that induces insureds to answer truthfully questions about their losses. Prejudice from a post-loss misrepresentation, therefore, is unnecessary to relieve the insurer of its liability. *See Claflin, supra,* 110 *U.S.* at 96–97, 3 *S.Ct.* at 516, 28 *L.Ed.* at 82; *Fine, supra,* 725 *F.*2d at 183–84; *Passero v. Allstate Ins. Co.,* 196 *Ill.App.*3d 602, 606–07, 143 *Ill.Dec.* 449, 452, 554 *N.E.*2d 384, 387 (1990).

-III-

The Appellate Division found Chubb's "concealment or fraud" clause to be ambiguous and insufficient to deny coverage for Longobardi's material misstatements to Chubb while it was investigating his loss. Our reading of the provision leads us to a contrary result. The clause denies coverage to "any *insured* who has intentionally concealed or misrepresented any circumstance relating to this insurance." We are convinced that a reasonable person reading that provision would under-

stand that it includes misrepresentations made to the insurer, whether made during the application or claims processes.

The clause is written in the present perfect tense. It denies coverage to "any *insured* who has intentionally concealed or misrepresented * * *." Longobardi contends that the use of that tense indicates that the clause refers to a time in the past and that it imposes an obligation of honesty on the insured only before the issuance of the policy. As he sees it, if Chubb had intended him to be honest after the issuance of the policy, it should have used the present perfect progressive tense, denying coverage to "any insured who has been intentionally concealing or misrepresenting any material fact or circumstance relating to this insurance." Whatever merit lies in that argument is too precious to be dispositive. The meaning of the provision is clear to the reasonable reader, regardless of hidden "ambiguities" that can be unearthed by grammatical digging.

Consistent with the legislative mandate for plain English, Chubb wrote its policy so that any reasonable person would understand it. By avoiding legalistic phraseology and complex sentence structures, the clause simply and clearly conveys its meaning. No useful purpose would be served by admonishing an insurer to use plain English and then binding it to a legalistic construction of a policy that it writes to comply with that admonition.

Longobardi's lies were sufficient for Chubb to nullify the policy. The jury found that he knowingly made a material false statement during his examination under oath or in his written statement "in an effort to or for the purpose of hindering, deflecting or misleading defendant in the course of its investigative process." Construed in light of the test of prospective reasonable relevancy, the misstatements were material. Chubb was legitimately concerned about Longobardi's relationship with Isgro and Kitsakos, both of whom were involved in insurance-fraud schemes involving facts similar to those that gave rise to Longobardi's claim. In response to Chubb's under-

standable inquiry about his relationship with Isgro and Kitsakos, Longobardi wilfully and knowingly denied knowing them. His statement at trial that he had misrepresented those facts "because he felt the examination had a 'hidden agenda' and was 'extremely accusatory,' " 234 *N.J.Super.* at 12, 560 *A.*2d 68, is not convincing. Longobardi wilfully lied to his insurer about information in which it was legitimately interested, despite the policy's clear statement that coverage would be denied in the face of such lies. This is not a case of an insured making a misstatement due to oversight, a misstatement regarding an irrelevant trifle, or one made during a bad faith investigation. See J. Appleman, *Insurance Law & Practice* § 3552 at 563–65, § 3587 at 595 (1970 & Supp.1990). In light of the obvious materiality of Longobardi's misstatements to Chubb's concerns when investigating his claim, we conclude that the trial court's charge viewed in its entirety does not constitute plain error under *Rule* 2:10–1. We further conclude that the trial court correctly entered judgment dismissing the complaint.

Our resolution of the preceding issues in Chubb's favor renders it unnecessary for us to consider the exclusion of the testimony of Chubb's former underwriter, which was sustained by the Appellate Division. 234 *N.J.Super.* at 33, 560 *A.*2d 68.

The judgment of the Appellate Division is reversed, and the judgment of the Law Division dismissing the complaint is reinstated.

*For reversal and reinstatement*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, O'HERN, GARIBALDI, POLLOCK and STEIN—7.

*Opposed*—None.