**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4224-18

MARGIN HOLDINGS,
LTD., LLC,

      Plaintiff-Appellant,

v.

FRANKLIN MUTUAL
INSURANCE COMPANY,

      Defendant/Third-Party
      Plaintiff-Respondent,

v.

SAMUEL ORNSTEIN,

      Third-Party Defendant-
      Appellant.

_____

      Argued January 31, 2022 – Decided February 14, 2022

      Before Judges Sabatino, Rothstadt, and Mayer.

      On appeal from the Superior Court of New Jersey, Law
      Division, Somerset County, Docket No. L-0032-16.

Brian M. Block argued the cause for appellants Margin Holdings, Ltd., LLC, and Samuel Ornstein (Mandelbaum Salsburg, PC, attorneys; Michael F. Bevacqua, Jr., of counsel and on the briefs; Brian M. Block, on the briefs).

Christian R. Baillie argued the cause for respondent (Methfessel & Werbel, Esqs., attorneys; Richard A. Nelke, of counsel and on the brief; Christian R. Baillie, on the brief).

PER CURIAM

This dispute involves a first-party insurance claim regarding two separate alleged incidents of vandalism and theft of auto parts, for which the insurer denied payment to the policyholder based on a misrepresentation/fraud clause in the insurance policy. After the insurer denied the claim, the policyholder filed suit for coverage. The insurer counterclaimed, alleging the policyholder committed common-law and statutory insurance fraud. The trial court granted summary judgment to the insurer on liability and entered a final monetary judgment in its favor. The policyholder and a third-party defendant now appeal, alleging the trial court committed multiple errors.

For the reasons that follow, we vacate summary judgment and remand the matter for further proceedings. Among other things, we conclude a jury, not a judge, should resolve the parties' central dispute as to whether the policyholder

made material misrepresentations to the insurer in connection with its claims of covered losses.

I.

Since we are vacating summary judgment and remanding for further development of the record and the resolution of disputed facts, we do not present here a comprehensive narrative. Instead, we summarize the facts and allegations as succinctly as possible in this complex and highly contentious case.

The Insured Units and the Alleged Losses

The alleged incidents of loss occurred on September 28, 2014 and October 11, 2014, respectively, at the same commercial condominium unit located on Woodfern Road in Branchburg, New Jersey (the "Subject Unit"). The Subject Unit was located within the Dobie Plantation Condominium Complex, consisting of thirty-six commercial real estate units. These units were developed and managed by Branchburg Commerce Park, LLC ("BCP"). The Dobie Plantation Condominium Complex was originally operated by a company called the Dobie Plantation Condominium Association, which was acquired by BCP in June 2000.[1]

_____

[1] The parties refer to the condominium complex as "Branchburg," which we will use at times in this opinion.

A-4224-18

The Subject Unit was one of thirteen units at the complex allegedly owned by plaintiff Margin Holdings Ltd., LLC ("Margin"), and insured by defendant/counterclaimant/third-party plaintiff, Franklin Mutual Insurance Company ("Franklin Mutual"). In October 2014, Margin, the policyholder, filed claims with Franklin Mutual regarding the vandalism and theft. After an eleven-month investigation, on September 24, 2015, Franklin Mutual denied the vandalism and theft claims, invoking the "Concealment/Misrepresentation/Fraud" provision in the insurance policy.

Disputed Ownership

At the heart of this appeal is the question of who owned the insured property and the auto parts at the time of the vandalism and theft claims, and whether appellants' representations about ownership were untruthful.

Documents in the record show that in or about June 2000, BCP acquired all thirty-six units at Branchburg. BCP was owned by three separate LLCs whose members, Howard Bernard, Loren A. Schultz, and third-party defendant Samuel Ornstein, also operated BCP.

On January 4, 2013, BCP filed for bankruptcy, with Ornstein signing the petition as Manager of the LLC. At the time of the bankruptcy petition, BCP was one-third owned by Bernard's company and two-thirds owned by

Creweonline.com, Ltd. ("Creweonline"), a company owned by Ornstein that appeared to have acquired Schultz's former interest in BCP. As part of the bankruptcy plan, BCP agreed to sell all the units it owned at the complex and to use the proceeds to pay off BCP's creditors.

Vincenzina "Gina" Martorana formed Margin, admittedly with the assistance of Ornstein, to acquire some of BCP's property at Branchburg. Martorana, through her entity Margin, first bought four units at the complex in November 2013. In August 2014 Margin acquired an additional nine units, including the Subject Unit at issue here. The record suggests that some of the units acquired by Margin were already leased by commercial tenants. The rent payments from these occupants were apparently collected by Ornstein and his management company on Margin's behalf. Ornstein acknowledged he acted as a consultant to Margin.

The Insurance Policy

Franklin Mutual initially issued a Businessowners insurance policy to Margin in November 2013 (the "Policy") for three of Margin's units at the complex, with an endorsement in 2014 adding four additional units owned by Margin, including the Subject Unit (the "Endorsement").

The Endorsement included coverage for the Subject Unit up to $355,000 for business personal property, as well as coverage for loss of business income, but it did not include any coverage for the building itself, unlike the coverage for the other units owned by Margin and covered by the Policy.

The auto parts, the subject of the theft claim Margin filed, apparently came into Margin's possession on September 9, 2014, when Margin entered into an Agreement of Sale and Real Estate Lease with Turner Resources, Ltd. (another company owned by Ornstein). Pursuant to that agreement, Margin would acquire a collection of new and used Rolls-Royce and Bentley auto parts, in exchange for Margin providing Turner "the exclusive use of, and ultimately clear title to, a 2003 Bentley . . . currently leased . . . to Margin." In addition, Margin would continue to pay all expenses related to the 2003 Bentley, including lease payments, insurance, and maintenance costs, until the end of the lease term in May 2017, as well as granting a lease to Turner for the Subject Unit for a term of five years at an annual rate of $1, with Turner responsible only for utility consumption. Finally, the agreement provided that Margin would offer Turner a lease renewal option for the Subject Unit at an annual rate of $24,000 upon the termination of the initial five-year term.

A-4224-18

The auto parts are not mentioned specifically in the Policy or the Endorsement. However, the claim is predicated on those parts being insured property located within the Subject Unit.

Notably, Franklin Mutual does not contend—or present any proof—that Margin made fraudulent representations in connection with the application for insurance. The fraud issues here are confined to Margin's claims.

The Acts of Vandalism and Theft

Less than a month after Margin came into possession of the auto parts and signed the lease with Turner, on September 28, 2014, the Subject Unit was vandalized. On October 11, 2014, some of the auto parts acquired by Margin from Turner were stolen.

As mentioned previously, Margin filed claims for losses arising out of these incidents later in October 2014. Nearly a year later, in September 2015, Franklin Mutual declined the claims, citing the Fraud clause in the Policy.

Franklin Mutual presents no evidence to contradict that the Subject Unit was actually vandalized or that auto parts were actually stolen from it. Nor does Franklin Mutual argue that acts of vandalism are not covered under the Policy.

Rather, Franklin Mutual based its denial of Margin's claims on evidence uncovered in its investigation allegedly showing that Margin and its "authorized

7

members, representatives and agents" violated the Fraud clause of the Policy,[2] including when such agents of Margin "intentionally made willfully false statements as to material facts . . . during . . . Examinations Under Oath [("EUOs")]."

The insurer's declination letter did not identify any specific misrepresentations or name any of Margin's agents who allegedly made such misrepresentations, although the only two individuals whose EUOs are mentioned in the parties' briefs are Martorana and Ornstein.

After Franklin Mutual denied an internal "appeal" of the claims' denial, the instant litigation ensued.

---

[2] The Fraud clause of the Policy states:

> This policy is void, <u>if either before or after a loss or *occurrence* or claim</u>, any *insured* misrepresents or knowingly conceals any material fact or circumstance, commits fraud, or swears falsely <u>relating to any aspect of this insurance</u> (including the information *we* relied upon in issuing this contract). However, if *we* specifically choose not to declare this policy void, *we* do not provide insurance under this policy to, or for the benefit of, any such *insureds*.
>
> [(Emphasis added).]

A-4224-18

Margin filed its initial complaint with a jury demand in the Law Division in January 2016 alleging Franklin Mutual improperly denied its first-party insurance claims. In its answer, Franklin Mutual, among other things, counterclaimed and asserted that Margin made material misrepresentations in violation of the New Jersey Insurance Fraud Prevention Act ("IFPA"), N.J.S.A. 17:33A-1 to -30. Franklin Mutual asserted that Martorana misrepresented her relationship with Ornstein and Ornstein's role in Margin, and that she is a "front" for Ornstein.

Franklin Mutual also filed a third-party complaint against Ornstein alleging, among other things, that he was the "Owner, Principal, Chief Operating Officer and/or Chief Executive Officer of Margin" and had filed a fraudulent claim under Margin's insurance policy in violation of the IFPA by concealing and misrepresenting the ownership and operation of Margin and various other related companies. In his response to the third-party complaint, Ornstein denied he was an Owner/Managing Member of Margin.

The Claims Investigation

During discovery, appellants learned that Franklin Mutual, while initially assigning the claims to an employee, had retained an independent adjuster,

9                                                                    A-4224-18

Decker Associates ("Decker"), to assist with its investigation. Decker thereafter raised alarm about the lack of coverage for the theft of the auto parts, because such parts were not mentioned in either the Policy or Endorsement.

In December 2014, Franklin Mutual retained a law firm, Methfessel & Werbel, to assist in its investigation. That law firm has continued to represent Franklin Mutual throughout this litigation.

Upon learning of Decker's involvement in the claims investigation, Margin served a subpoena duces tecum upon Decker, requesting all related documents, in February 2017. Methfessel & Werbel, as the insurer's counsel, forwarded thirty-five documents from Decker, with numerous documents redacted for various reasons, including "work product privilege" and "attorney-client privilege." In the letter accompanying the documents, Franklin Mutual alleged it was improper for Margin to contact Decker directly, since in its Responses to Interrogatories, Franklin Mutual had identified an employee of Decker as an expert witness to testify for it at trial.

Margin, meanwhile, objected to what it viewed as Franklin Mutual's counsel's interference with a non-party's subpoena. On April 24, 2017, Margin filed a motion to compel production of unredacted copies of "non-party, fact witness Decker's documents." While Franklin Mutual's response to the motion

was pending, Franklin Mutual's counsel sent a letter to the court on May 9, 2017, and copying Margin's counsel, advising that the trial judge's sole law clerk had accepted prospective employment with its firm to commence in September 2017 and thus would need to be screened from this case.

On May 17, 2017, Franklin Mutual filed partial opposition to the motion to compel, maintaining objections to eleven of the thirty-five produced documents while agreeing to disclose unredacted the remaining twenty-four documents. In its reply brief, filed on May 22, 2017, Margin waived objections to three of the remaining eleven disputed documents, thus narrowing its request to eight documents ("Eight Disputed Documents").

The trial court was supplied with the Eight Disputed Documents to perform an in camera review. Eventually, the trial court ruled, after a series of orders, that the Eight Disputed Documents were privileged and undiscoverable.

Summary Judgment Motion Practice

After this drawn-out discovery dispute, Franklin Mutual moved for summary judgment on November 1, 2018, seeking the dismissal of Margin's complaint and the grant of summary judgment on Franklin Mutual's counterclaim and third-party complaint against Ornstein alleging violations of the IFPA. In its motion papers, Franklin Mutual identified Ornstein as an agent

11

of Margin who made material misrepresentations in violation of the Policy. The moving papers further included a "non-exhaustive" list of post-claim-denial material misrepresentations, comprising eleven bullet points (the "Bullet Points").

In response, Margin and Ornstein cross-moved for summary judgment, seeking dismissal of Franklin Mutual's affirmative defense under the Fraud clause of the Policy, the counterclaim in its entirety, and Franklin Mutual's third-party complaint against Ornstein. In their submission, Margin and Ornstein asserted that nine of the eleven Bullet Points listed by Franklin Mutual were alleged misrepresentations uncovered during discovery in the instant litigation, rather than during Franklin Mutual's pre-claim-denial investigation, and thus inappropriately cited as a basis for denying coverage.

The Court's Grant of Summary Judgment for Franklin Mutual

After hearing oral argument, the trial court entered an order on January 4, 2019 granting summary judgment to Franklin Mutual: (1) on its affirmative defense, thereby dismissing Margin's Amended Complaint, (2) on its IFPA counterclaims against Margin, and (3) on its IFPA third-party claims against Ornstein. The order further requested that Franklin Mutual submit a "Certification of Fees, Costs, and Investigation Expenses within [seven] days."

A-4224-18

The trial court entered another order the same day denying Margin and Ornstein's cross-motion for summary judgment in full.

A six-page letter opinion accompanied both orders, finding in key part that Ornstein was an agent of Margin, and at the very least, Bullet Points 2 and 10 represented actionable material misrepresentations under the Policy's Fraud clause.

Final Judgment

After Franklin Mutual submitted a certification of investigatory costs, the trial court entered a final order of judgment for Franklin Mutual on April 16, 2019, directing Margin and Ornstein, jointly and severally, to pay Franklin Mutual $108,163.51.

This Appeal

The instant appeal by Margin and Ornstein ensued. Franklin Mutual has not cross-appealed.

On appeal, Margin and Ornstein assert: (1) this court should reverse the grant of summary judgment for Franklin Mutual and instead grant summary judgment for Margin and Ornstein, because (a) the insured did not make misrepresentations; (b) Franklin Mutual did not and could not provide any evidence on the key element of materiality; (c) any misrepresentations made

during the instant litigation after the insurer had already denied the claims are irrelevant as a matter of law; and (d) Franklin Mutual did not prove damages, one of the four elements required to prevail on an IFPA claim. In the alternative, appellants request that, at the very least, we vacate the judgment entered in favor of Franklin Mutual and remand for a jury trial.

Additionally, Margin and Ornstein urge this court to reverse the discovery orders denying Margin's motion to compel the production of the Eight Disputed Documents. They contend the trial court's various rulings concerning that requested discovery are inconsistent and lack sufficient findings grounded in the record.

## II.

## A.

We begin by underscoring well-established principles governing summary judgment practice. The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); see also R. 4:46-2(c). A court must not resolve contested factual issues but instead must determine whether there are any

14

genuine factual disputes.  Rozenblit v. Lyles, 245 N.J. 105, 121 (2021) (citations omitted).  If there are materially disputed facts, the motion for summary judgment should be denied.  Parks v. Rogers, 176 N.J. 491, 502 (2003); Brill, 142 N.J. at 540.  To grant the motion, the court must find that the evidence in the record "'is so one-sided that one party must prevail as a matter of law.'"  Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

Our review of an order granting summary judgment, as here, must observe the same standards, including an obligation to view the record in a light most favorable to the non-moving parties.  See Estate of Narleski v. Gomes, 244 N.J. 199, 205 (2020) (citing Harz v. Borough of Spring Lake, 234 N.J. 317, 329 (2018)).  We accord no special deference to a motion judge's assessment of the documentary record, as the decision to grant or withhold summary judgment does not hinge upon a judge's determinations of the credibility of testimony rendered in court, but instead amounts to a ruling on a question of law.  See Manalapan Realty, L.P. v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995) (noting that no "special deference" applies to a trial court's legal determinations).

Substantively, we frame our analysis with due regard to long-standing precedents concerning both common-law insurance fraud as well as statutory insurance fraud under the IFPA.

In general, insurance policies are liberally construed to afford coverage that a fair interpretation will allow. Villa v. Short, 195 N.J. 15, 24 (2008); Am. Wrecking Corp. v. Burlington Ins. Co., 400 N.J. Super. 276, 282 (App. Div. 2008). However, "courts cannot write for the insured a better policy of insurance than the one purchased." Mem'l Props., LLC v. Zurich Am. Ins. Co., 210 N.J. 512, 525 (2012) (quoting Flomerfelt v. Cardiello, 202 N.J. 432, 441 (2010) (internal quotation marks omitted)).

These general principles have been developed and applied within the more specific context of an insurer's allegation that a policyholder has submitted a fraudulent claim. Over thirty years ago in the seminal case of Longobardi v. Chubb Ins. Co. of N.J., 121 N.J. 530, 537-42 (1990), our Supreme Court performed an extensive analysis of a "concealment or fraud" clause, which mandated "forfeiture by an 'insured who has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance.'" Id. at 537 (quoting the subject insurance policy). In construing that provision, the Court noted in Longobardi that the law disfavors forfeitures; thus, such fraud

16

clauses "should be construed if possible to sustain coverage." Ibid. (citing

Hampton v. Hartford Fire Ins. Co., 65 N.J.L. 265, 267 (E. & A. 1900)).

Longobardi was a case of first impression for the Court to consider

whether fraud clauses "apply when an insured misrepresents facts to the insurer

that is investigating a loss." Id. at 538. The Court concurred with other federal

and state courts that found such clauses applicable for post-loss investigations.

Ibid. Thus, the Court held:

> When an insurer clearly warns in a "concealment or
> fraud" clause that it does not provide coverage if the
> insured makes a material misrepresentation about any
> material fact or circumstance relating to the insurance,
> the warning should apply not only to the insured's
> misrepresentations made when applying for insurance,
> but also to those made when the insurer is investigating
> a loss. Such misrepresentations strike at the heart of
> the insurer's ability to acquire the information
> necessary to determine its obligations and to protect
> itself from false claims. Thus, an insured's commitment
> not to misrepresent material facts extends beyond the
> inception of the policy to a post-loss investigation.
>
> [Longobardi, 121 N.J. at 539 (emphasis added).]

That said, the Court in Longobardi cautioned that such a post-loss

misrepresentation must be "knowing and material" for the policy to be voided.

Id. at 540. A "mere oversight or honest mistake will not cost an insured his or

her coverage; the lie must be wilful[l]." Ibid. (citations omitted). The Court

17

further noted "[t]he insured's motive for lying . . . is irrelevant." Ibid. Thus, "it does not avail insureds to lie for reasons that appear to them to be sufficient." Ibid.

Of particular relevance for the present appeal, the Supreme Court in Longobardi made clear that "[n]ot every knowingly false statement made by an insured, however, will relieve an insurer of its contractual obligations. Rather, forfeiture results only when the fact misrepresented is material." Ibid. (emphasis added).

Further expounding on this materiality requirement, we stated in Selective Ins. Co. v. McAllister, 327 N.J. Super. 168, 178 (App. Div. 2000), that materiality "generally is a question of fact to be determined by a jury." We reached that conclusion through an examination of Longobardi and a Second Circuit decision cited therein, Fine v. Bellefonte Underwriters Ins. Co., 725 F.2d 179, 183 (2d Cir. 1984).

In Longobardi, questions of materiality as to misrepresentations in an insurance fraud case were decided by a jury after a trial, and that procedure was upheld by the Supreme Court on appeal. 121 N.J. at 536-43. The Court instructed that materiality "should be judged as of the time when the misrepresentation is made," as hindsight "is irrelevant to the materiality of an

insured's misrepresentation to an insurer." Id. at 541. As the Court explained, "[a]n insured's misstatement is material <u>if when made a reasonable insurer would have considered the misrepresented fact relevant to its concerns and important in determining its course of action</u>." Id. at 542 (emphasis added). The Court found this standard would incentivize insureds to tell the truth, since it would dissuade an insured from gambling that a lie will turn out to be unimportant to the resolution of its claim. Id. at 541-42. In so holding, the Court rejected this court's assertion that the insurer must have been prejudiced by the misrepresentation; thus, the standard, while high, is not impossible to meet. Id. at 542.

As the United States Supreme Court recently advised in another litigation setting, materiality is a context-dependent question, and often involves "factual determinations uniquely suited for a jury." CITGO Asphalt Ref. Co. v. Frescati Shipping Co, Ltd., __ U.S. ___, __, 140 S. Ct. 1081, 1089 n.4 (2020); see also TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976) (observing that materiality becomes a question of law only when no reasonable jury, based on undisputed facts in the record, could reach anything but one conclusion).

The Court in Longobardi did not discuss the IFPA at length, although it mentioned one of the statute's provisions, N.J.S.A. 17:33A-4(a)(1), when

19

defining what type of misrepresentation would give rise to a claim under the IFPA. 121 N.J. at 540 (stating the statute "proscrib[es] knowing misrepresentations by insured in presentation of claims").

Not only must a misrepresentation be made knowingly to violate the IFPA, but it also must be material. The IFPA, enacted in 1983, is a comprehensive statute that codifies the Legislature's goal "to confront aggressively the problem of insurance fraud[.]" N.J.S.A. 17:33A-2; see also Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 171-72 (2006). The IFPA aims to address societal harms "by facilitating the detection of insurance fraud, eliminating the occurrence of such fraud through the development of fraud prevention programs, requiring the restitution of fraudulently obtained insurance benefits, and reducing the amount of premium dollars used to pay fraudulent claims." N.J.S.A. 17:33A-2; see also Selective Ins. Co. of Am. v. Hudson E. Pain Mgmt. Osteopathic Med., 210 N.J. 597, 609-10 (2012); State v. Sailor, 355 N.J. Super. 315, 319 (App. Div. 2001).

In a more recent opinion, the Supreme Court in Allstate N.J. Ins. Co. v. Lajara, 222 N.J. 129, 147-48 (2015) illuminated the similarities and differences between a private-party action brought under the IFPA and a cause of action for common-law insurance fraud.

A successful common-law fraud claim requires: "(1) a <u>material</u> misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable <u>reliance</u> thereon by the other person; and (5) resulting damages." <u>Id.</u> at 147 (emphasis added) (quoting <u>Banco Popular N. Am. v. Gandi</u>, 184 N.J. 161, 172-73 (2005)).

By comparison, to prevail on an IFPA claim,

> an insurance company must demonstrate that: (1) the defendant "presented" a "written or oral statement"; (2) the defendant knew that the statement contained "false or misleading information"; and (3) <u>the information was "material" to "a claim for payment or other benefit</u> pursuant to an insurance policy . . . . " N.J.S.A. 17:33A–4(a)(1). The insurance company must also prove a fourth element—that it was "damaged as the result of a violation of [the IFPA]." N.J.S.A. 17:33A–7(a).
>
> [<u>Lajara</u>, 222 N.J. at 147-48 (emphasis added).]

"The only element of a claim for common-law fraud absent from an IFPA claim is reliance by the plaintiff on the false statement." <u>Id.</u> at 148.

The Court held in <u>Lajara</u> that a defendant has a right to a trial by jury in a private action brought under IFPA. <u>Id.</u> at 148-49.[3] The Court did not address whether materiality was a question of fact for the jury under the IFPA. At the very least, the Court did not identify that as a difference between an IFPA claim and a common-law claim.[4]

B.

The motion judge concluded as a matter of law that Margin made at least two material misrepresentations of fact to Franklin Mutual during the post-loss investigation of the claims. Specifically, the judge adopted the defense theory that Ornstein was an agent of Margin and that Bullet Points 2 and 10 were material misrepresentations that entitled Franklin Mutual to a judgment of liability on both its common-law claim of insurance fraud and its IFPA claim.

---

[3] In the present case, both Margin and Franklin Mutual made jury demands in their respective pleadings.

[4] The Court did observe in <u>Lajara</u> that the presence of the damages element permitted an insurer "to seek money damages, and even treble damages if 'the defendant has engaged in a pattern of violating [the IFPA]." 222 N.J. at 148 (quoting N.J.S.A. 17:33A-7(b)). In this vein, the Court found it notable that "attorneys' fees, investigatory costs, and costs of suit are, by definition, compensatory damages under the IFPA, and therefore a successful lawsuit initiated by an insurance company will necessarily involve an award of damages." <u>Ibid.</u> (citing N.J.S.A. 17:33A–7(a)).

With all due respect to the trial court, that critical determination of materiality, in the circumstances presented, should have been reserved for a jury.

Bullet Points 2 and 10 both concern allegations of material untrue statements made in connection with the ownership of the Subject Unit. We discuss them in turn.

Bullet Point 2: Sprecher's Deposition Testimony

In Bullet Point 2, Franklin Mutual contends a material misstatement was made in Margin's submission "of the deed transfer from Branchburg Commerce Park, LLC to Margin Holdings for the second sale [of the premises] indicating that [an individual named] Andrew Sprecher was the Director/Secretary/Treasurer of Creweonline.com, Ltd., the 'Sole Member' of Branchburg Commerce Park, LLC."

Sprecher's name appears on the August 2014 deed that conveyed nine condominium units, including the Subject Unit, from BCP to Margin. The typed portion of the deed below his signature identifies Sprecher as the "Director/Secretary/Treasurer" of Crewonline.com, Ltd., which was the sole member of the grantor, BCP.

During this litigation, Sprecher was deposed as a witness. When shown the August 2014 deed, he acknowledged that his true signature appeared on the

23

deed. Sprecher did not remember whether he was ever a director, secretary, or treasurer of Crewonline.com, and did not know or remember anything about the entity. He stated that he signed the deed because Ornstein had asked him to sign it. Sprecher also did not know at his deposition if "the LLC" [Crewonline.com or BPC] had been the only owner of the premises, although he had signed an affidavit of title attesting to that. He also testified that his signature on an office space lease between BCP and Margin, and a HUD Settlement form[5] was not his own. He did recall signing as "an authorized secretary" of an entity on a notarized document about five years earlier, but he could not recall the entity's name.

Franklin Mutual contends that Sprecher's deposition testimony proves that the BCP deed to Margin was part of a "sham transaction" designed to conceal Ornstein's involvement in not only the sale of the property, but his role in each of the LLCs. In its reply brief, Franklin Mutual stipulates that Sprecher may have been a "secretary" of Crewonline.com, but maintains he was not director or treasurer of the entity.

---

[5] We note the lease and HUD form were not documents submitted by Margin to the insurer in support of its claims of loss, but instead were obtained later in discovery.

Despite the suspicions raised by Sprecher's deposition testimony, we are not persuaded it conclusively shows that Margin made material misrepresentations to Franklin Mutual in connection with its loss claims for the premises. Viewing the summary judgment record, as we must, in a light most favorable to Margin, see R. 4:46-1—and bearing in mind the general guidance of Longobardi and other case law allocating materiality issues to juries—we hold that genuine questions of fact and credibility are raised by Bullet Point 2.

For one thing, it appears undisputed that the Policy was procured by Margin and that apparently Margin paid the premiums for that insurance coverage. No other competing claimant or owner of the unit or the auto parts within it has emerged, in nearly a decade since the loss was reported.

It is not self-evident that a reasonable insurer would have been misled and would have had a sound basis to deny the claims simply because of an asserted defect in the property's deed if, in fact, the policyholder that paid the premiums is the same party filing the claims and presenting proof of the theft and vandalism. The record needs to be developed more on this point, possibly with the benefit of expert testimony, and the associated materiality issues resolved by a jury.

A-4224-18

In addition, even as we duly note the chain of title concerns raised by Sprecher's deposition that can be presented to a trier of fact, Franklin Mutual thus far has not established that Margin lacks an insurable interest in the Subject Property, a factor that is undoubtedly pertinent to materiality. See Balentine v. N.J. Underwriting Ass'n, 406 N.J. Super. 137 (App. Div. 2009). Nor has Franklin Mutual yet proven that this potential defect in title is material to and affects its resolution of Margin's claims.

In Balentine, this court applied the long-settled principle that "to recover proceeds on an insurance policy, the insured must have an insurable interest in the realty, chattel or person covered by that insurance." Id. at 141 (citing Shotmeyer v. N.J. Realty Title Ins. Co., 195 N.J. 72, 85-87 (2008)). The test for whether an insured has an insurable interest in property is "whether the insured has such a right, title or interest therein, or relation thereto, that he will be benefited by its preservation and continued existence or suffer a direct pecuniary loss from its destruction or injury by the peril insured against." Ibid. (quoting Hyman v. Sun Ins. Co., 70 N.J. Super. 96, 100 (App. Div. 1961)) (internal quotations omitted).

We specifically analyzed in Balentine whether "the record owner of real property, who is serving as the nominee of another person, has an insurable

26

interest in that realty sufficient to recover the proceeds of a vandalism policy on which he is listed as a named insured." Id. at 139. In that case, both plaintiffs, Balentine and Gianetta, initially co-owned a commercial property. Ibid. When Balentine was in bankruptcy, the plaintiffs jointly transferred the property to Gianetta for one dollar, while allowing Balentine to continue using the property for business purposes. Ibid. Gianetta also issued a power of attorney to Balentine, which allowed the latter to pay "the property taxes, insurance premiums, utilities and other expenses for the premises." Ibid. In the underlying insurance policy providing coverage for the building, the named insured was listed as "Gianetta c/o . . . Balentine." Ibid.

In denying the vandalism claim filed on behalf of Gianetta, the insurer decided that Gianetta was "merely Balentine's nominee," as Gianetta did not personally pay the taxes, utilities, or other charges on the building. Id. at 140. The insurer posited that, "upon information and belief . . . [the] 'plaintiffs arranged to place the property in plaintiff Gianetta's name in order to shield it from plaintiff Balentine's creditors.'" Id. at 140-41.

We held in Balentine that Gianetta had an insurable interest in the property despite the insurance company's assertion he had no pecuniary stake in the building. Id. at 143. We noted that Gianetta, as the named property owner,

27

would be liable "[i]f the real estate taxes were unpaid" or "an occupant or visitor were injured by a dangerous condition on the premises."  Id. at 144.  We acknowledged "Gianetta may not have had much of an upside in owning the building . . . but he surely had a downside if the premises were left uninsured." Ibid.  We further noted the unfairness of adopting the insurer's argument that neither Gianetta nor Balentine deserve to be paid for this loss, as such a holding "would create a windfall for the insurer, allowing it to retain the premiums it reaped on this policy without providing anything in return."  Ibid. (emphasis added).

Franklin Mutual theorizes that Margin purchased the thirteen units at BCP, including the Subject Unit, as a means for Ornstein to defraud creditors. But as this court in Balentine noted, such a determination affecting the rights of creditors should be made in another forum and is not appropriate to resolve in this insurance dispute.  Id. at 145.

Further, there is evidence that funds were paid on behalf of Margin, with the assistance of a mortgage loan from Wells Fargo, to acquire the premises.  As the record owner, Margin presumably would be responsible if real estate taxes or utilities were unpaid or if someone were injured on the premises.

Regarding the two claims at the subject of the current litigation, Ornstein voluntarily attended an EUO held by Franklin Mutual in 2015, where he stated that he acted as a consultant to Margin, however he was not a policyholder or owner, and has "nothing to gain from [the claims]." We are aware that Ornstein apparently has made contrary statements to FEMA or otherwise indicating a greater role. These cited inconsistencies should be assessed under the totality of circumstances by a trier of fact.

Franklin Mutual also takes issue with the fact that the Subject Unit was sold for much less than its fair market value, citing to Bernard's 2017 petition to reopen the bankruptcy proceedings for BCP, which sold the Subject Unit to Margin. However, as the Supreme Court held in Miller v. N.J. Ins. Underwriting Ass'n, 82 N.J. 594, 597 (1986) and as we noted in Balentine, the soundness of such a purchase does not disprove that Margin had an insurable interest in the Subject Unit.

Lastly, we must note the trial court did not provide specific reasons why Franklin Mutual met its burden of establishing materiality under Bullet Point 2. There is no ability to remand the matter for an amplified statement of reasons by the same judge, as the judge is now retired.

Bullet Point 10: Ornstein's EUO Testimony

We reach the same conclusion with respect to Franklin Mutual's Bullet Point 10, finding that it also raises questions of materiality for a jury to resolve.

In Bullet Point 10, Franklin Mutual posits Ornstein lied several times regarding the ownership of the units. Specifically, Bullet Point 10 avers there was a material misrepresentation as to:

> Mr. Ornstein's sworn testimony that he did not know who the individual owners of [BCP] were, in spite of the fact that he previously represented himself to be the owner and/or an executive office of [BCP] and "owned" Creweonline.com, Ltd., which purportedly was the sole member of [BCP] per the deed transfer from [BCP] to Margin Holdings for the second sale of nine units.

In connection with these alleged misrepresentations by Ornstein, the parties dispute whether he is an "insured" under the Policy, with appellants arguing he is not, and Franklin Mutual arguing he is.

Again, it is not patently evident how these alleged misrepresentations by Ornstein are material to Margin's loss claims. As the Fraud clause of the Policy states, only statements made by an "insured" can nullify the Policy. The term "insured" is defined in two distinct ways in the Policy in Parts I and II. Presumably, since Margin is seeking recovery under Part I of the Policy, which covers damage to "Business Property and Loss of Business Income," and not

30

under Part II, which contains liability coverage provisions, only the Part I definition of "insured" would apply. That definition, which is narrower than the definition in Part II, defines the "insured" as "the person or entity designated as insured in the [Policy] Declarations." The Declarations identify the "named insured" on all four pages as "Margin Holdings LLC," and state in Item 3: "You [, the insured] are a: LLC."

Even if, for the sake of discussion, Ornstein was deemed to be included as an "insured" under the Part I coverages of the Policy, it is not certain why his statements referenced in Bullet Point 10 constitute misrepresentations, let alone material ones. In Ornstein's pertinent testimony cited by Franklin Mutual, the exchange was as follows:

> Q: And who owns Branchburg Commerce Park LLC?
>
> A: It's owned by a couple of other LLCs, other entities.
>
> Q: And ultimately the corporate owners involved, the people that are actually the owners of the other corporate entities?
>
> A: I don't know – I don't have all of that information, but I don't know whether that's something I can provide. I don't know what my responsibilities are to them in that regard.

We recognize that these professions of ignorance or lack of recollection could be found by a trier of fact to be untruthful. But that is a credibility

assessment to be made by a jury and not resolved on a written record. These statements made during the post-loss investigation could be found to be "knowing and material" misrepresentations that were willful on Ornstein's part. Conversely, they conceivably might be found to be matters of oversight or mistake. A jury should make that credibility assessment. Longobardi, 121 N.J. at 540 (citations omitted).

Further, Franklin Mutual does not conclusively establish why Ornstein's supposed misrepresentations about the ownership of BCP were material to the insurer's denial of Margin's claims. Although not explicitly stated, Franklin Mutual appears to rely upon Ornstein's prior bad acts in other bankruptcy and insurance fraud proceedings, as demonstrating a strong likelihood of Ornstein perpetrating fraud in this case. However, there are at least two problems with such reliance.

First, N.J.R.E. 404(b)(1) mandates that evidence "of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition." To be sure, such prior-acts evidence "may be admitted for other purposes, such as proof of motive, opportunity, intent, . . . plan, knowledge, identity, or absence of mistake . . . ." N.J.R.E. 404(b)(2). However, Franklin Mutual has not

32

specified under N.J.R.E. 404(b) the admissible purpose for which it repeatedly characterizes Ornstein as a "serial fraudster." The admissibility of any prior bad acts by Ornstein would need to be decided at or before the jury trial in a Rule 104 hearing, and weighed against the exclusionary factors of N.J.R.E. 403. The summary judgment context is not appropriate for such an admissibility ruling.

Second, as noted above, the materiality of Ornstein's statements about the ownership of BCP to Margin's claims of loss should not be presumed. As we already noted, the named insured for a Part I claim under the Policy is Margin, not Ornstein. Margin apparently paid the premium, is shown on the deed as the record owner, and is the party seeking payment for the claim. Franklin Mutual has the burden of proving that Ornstein's alleged misrepresentations, if their falsity had not been uncovered, would likely have caused the loss claim to be paid to the wrong owner. That is by no means certain. The strength of the evidence in meeting the insurer's burden of proof should be litigated at a trial. Hence, Bullet Point 10 cannot sustain a grant of summary judgment.

Conclusion

In essence, the core dispute here appears to revolve around a series of several unresolved questions. Did Margin—which is identified on the deed as the Subject Unit's owner, which was listed on the Policy as the insured, and

which paid the premiums—wrongfully try to get paid on claims for losses on property it did not actually own? If so, then who did own the property instead? Was it BCP? Was it some other entity? Was it Ornstein? What exactly was Ornstein's role concerning the property? Did he have an insurable interest? Did anyone else? Do any of these answers materially eliminate the insurer's obligation to pay on the claims if the losses are proven? These are all fact-laden and credibility-dependent questions bearing on materiality that must be sorted out by a jury, not by the court on a paper record.

In summary, we conclude the trial court prematurely granted the insurer summary judgment on these thorny questions of materiality. The court strayed from well-established precedent in not allowing a jury to resolve them. The orders granting summary judgment, which were solely founded on Bullet Points 2 and 10, are accordingly vacated. Because these are issues for a jury, by the same logic we reject Margin's request to enter judgment in its own favor.

## III.

Given our decision to vacate summary judgment, we need not go further and resolve here other issues that are best decided in the first instance by the trial court.

34

In particular, we reserve for the trial court, if it turns out to be vital to reach it, the question of whether any alleged post-investigation misrepresentations, i.e., made by Margin during litigation, can support a claim of insurance fraud under the common law or the IFPA. The trial court did not address that issue and chose to focus solely on Margin's pre-lawsuit statements. We decline the invitation to resolve the issue here without the benefit of reasoned analysis and a fuller development of the record.

Similarly, we need not address here whether the method adopted by the trial court to quantify the insurer's damages through a certification, rather than testimony subjected to cross-examination, was appropriate. The judgment has been vacated, and the issues of damages may now be litigated anew, if necessary, at or following a trial on liability.

Lastly, we direct that a successor judge on remand must examine the Eight Disputed Documents in camera and make independent determinations of privilege and discoverability, as the present record and the previous series of rulings by the trial court do not enable meaningful appellate review. We decline the opportunity to perform de novo review of the documents ourselves.

All other issues raised on appeal lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

A-4224-18

Vacated and remanded. The trial court shall convene a case management conference within thirty days to plan the remand process. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION